David E. Bower (BAR# 119546)
Email: dbower@moneverdelaw.com
**MONTEVERDE & ASSOCIATES PC**
600 W. Corporate Pointe, Ste. 1170
Culver City, CA 90230
Telephone: (213) 446-6652
Facsimile: (212) 202-7880

*Attorney for Plaintiff Dean Drulias*

[Additional counsel on signature page]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

DEAN DRULIAS, derivatively on behalf
of TRUECAR, INC.,

           Plaintiff,

    vs.

MICHAEL GUTHRIE; VICTOR
("CHIP") PERRY; JOHN PIERANTONI;
ABHISEK AGRAWAL; ROBERT
BUCE; CHRISTOPHER CLAUS;
STEVEN DIETZ; JOHN KRAFCIK;
ERIN LANTZ; WESLEY NICHOLS;
ION YADIGAROGLU; JOHN MENDEL;
and UNITED STATES AUTOMOBILE
ASSOCIATION;

           Defendants,
    -and-

TRUECAR, INC., a Delaware corporation,

           Nominal defendant.

Case No.:

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Dean Drulias ("Plaintiff"), by his attorneys, alleges for his Verified Shareholder Derivative Complaint against defendants upon personal knowledge as to him/herself and his own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought on behalf of nominal defendant TrueCar, Inc. ("TrueCar" or the "Company"), by one of its shareholders against certain of the Company's officers and members of its Board of Directors (the "Board"), alleging that these officers and directors (collectively, the "Individual Defendants" as defined herein) breached their fiduciary duties by willfully and/or recklessly causing or allowing the Company to issue false and misleading statements or failing to disclose material adverse facts about TrueCar's business, operations and future prospects between February 16, 2017 and November 6, 2017.[1]

2.      TrueCar is a web-based automotive marketplace that purports to give consumers the "true" price, or market price, for new and used cars. According to its website, TrueCar shows consumers what others paid for the car they want so they can recognize a fair price. Users receive upfront pricing information when they connect with TrueCar Certified Dealers. TrueCar's success is dependent on its ability to obtain web traffic, leading to sales of cars, or "units," from its site. As TrueCar repeatedly stated in its filings with the U.S. Securities and Exchange Commission ("SEC"), a majority of the cars purchased by its users were matched to the car-buying sites maintained for its "affinity group marketing partners" or

---

[1] The relevant time period herein for the Individual Defendants' breaches of fiduciary duty is January 2016 through the present.

2

financial institutions and member organizations that, in exchange for marketing fees, exclusively direct their members to purchase a car through customized co-branded sites maintained by TrueCar. As a result, TrueCar's relationships with its "affinity group marketing partners" are critical to the Company's business and financial performance.

3.     The most significant of TrueCar's affinity partners was the United States Automobile Association ("USAA"), which generated nearly one-third of the Company's annual units and therefore its revenues. USAA was so critical to the Company's success that the Company's SEC filings contained a risk factor devoted solely to USAA, warning that "USAA has a ***significant influence*** on our operating results."[2] USAA was also TrueCar's largest shareholder, and a former senior executive of USAA – defendant Christopher Claus – served as Chairman of TrueCar's Board throughout the relevant time period.

4.     TrueCar was responsible for hosting, maintaining and operating the co-branded car buying website for USAA. As such, TrueCar was directly involved in any updates or changes to the car buying site. Nevertheless, TrueCar's SEC filings stated that USAA had "broad discretion" over how that site was operated, marketed and promoted. As a result, and because of USAA's crucial importance to the Company's financial success, TrueCar represented that if USAA were to use its "broad discretion" to make changes to the car buying site, it "could adversely affect our business and operating results in the future." Indeed, the filings expressly stated that if USAA made even minor adjustments in the way USAA promotes and markets, such as altering the location of the link to the TrueCar car buying site, TrueCar's business would be harmed.

---

[2] Unless otherwise stated, all emphasis herein is added.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.     In early 2017, the risks warned of in connection with USAA fully materialized. According to the Amended Class Action Complaint (Doc. No. 47) filed in the U.S. District Court for the Central District of California captioned *Milbeck v. TrueCar, Inc., et al.*, Case No. 2:18-cv-02612-SVW-AGR (C.D. Cal)(the "Securities Class Action"), former TrueCar employees confirmed that, by January 2017, USAA explicitly informed TrueCar that it had decided to significantly redesign the co-branded car buying website, that the redesign would be implemented by no later than June 2017, and that the changes were far more extensive than merely changing the location of the link to TrueCar's car buying service. *See* Class Complaint ¶6.[3] Specifically, USAA would now require its members to respond to numerous additional questions about their personal finances and monthly budgets before they could access the TrueCar site, in an effort to make sure its members could actually afford to purchase the cars. *Id.* As detailed in the Securities Class Action, this news prompted TrueCar to direct management of each of its departments Company-wide to hold internal all-hands-on-deck meetings beginning in January 2017. *Id.* These meetings were specifically convened in an effort to grapple with the USAA website changes and their expected fallout: negative responses from USAA members, resulting in dramatically lower traffic, units and revenues for TrueCar. According to the Securities Class Action and as upheld by the Court in its February 5, 2019 ruling denying defendants' motion to dismiss, defendants knew that the risk factors regarding USAA had come to fruition and what the inevitable negative effect of the substantial USAA website changes would be. *Id. See also* Order Denying Defendants' Motion to Dismiss, dated February 5, 2019 (Doc. No. 93). These

---

[3] References to "Class Complaint" and paragraphs therein refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Demand (Doc. No. 47) filed on August 24, 2018, in the Securities Class Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

changes, which amounted to what defendants would later refer to as a "significant website redesign," would inevitably and profoundly impact TrueCar's unit and revenue growth.

6.      Despite this reality, the Individual Defendants continued to deceptively advise investors in the Company's SEC filings of a mere "risk" that USAA might change its car buying website with TrueCar at some point "in the future" – giving investors the impression that no such risk had yet materialized, when, in fact, it already had. At the same time, between February 16, 2017 and November 6, 2017, the Individual Defendants repeatedly represented the Company's "return" to double-digit unit growth in excess of 20%, which it told investors would continue for the balance of 2017 and would be driven in large part by TrueCar's key affinity partnership with USAA. In reality, however, the Individual Defendants knew that when the significant USAA website changes were implemented in June 2017, TrueCar's traffic, unit sales, and revenues would materially decline.

7.      As TrueCar's stock skyrocketed by over 60% based on these misrepresentations (from approximately $13 per share to over $21 per share), certain insiders took full advantage, engaging in significant insider sales that yielded tens of millions of dollars in ill-gotten gains. Specifically, on April 26, 2017, the Company closed a secondary offering in which TrueCar sold only 1,150,000 shares of TrueCar common stock at $16.50 per share, realizing approximately $19 million, or just over 10% of the total proceeds from the offering. In contrast, USAA and the Insider Selling Defendants (defined below), which included several entities affiliated with members of TrueCar's Board of Directors – realized approximately 90% of the proceeds from the offering, or $151.8 million. USAA, which knew that it would have TrueCar implement changes to the co-branded TrueCar car buying website that would significantly reduce TrueCar's traffic, units and revenue, sold 26% of its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

TrueCar holdings, realizing $51.7 million in proceeds, or 34% of the total proceeds from the offering. USAA did so while its Board representative, defendant Claus, served as TrueCar's Board Chairman. Entities affiliated with TrueCar directors Steven Dietz, Ion Yadigaroglu and Abhishek Agrawal also sold substantial amounts of TrueCar stock in the Offering, collectively selling approximately 5.6 million TrueCar shares and collecting more than $90 million in proceeds, or over 50% of total proceeds from the Offering. While none of TrueCar's officers sold any of their TrueCar stock in the secondary offering, this was only because they were subject to a 90-day Lock-Up Period that was scheduled to expire on July 25, 2017. The top officers had a duty to block trading in the Company's shares due to material undisclosed information, but failed to do so. By the same token, USAA has a duty to refrain from trading due to its access to inside information, yet sold shares in violation of this duty.

8.     By June 2017, while investors remained unaware of USAA's material redesign of the co-branded car buying website, TrueCar implemented USAA's changes to the site, which almost immediately resulted in what the Individual Defendants already anticipated – a significant decline in traffic, units and revenues from USAA members, and for TrueCar overall. As detailed in the Securities Class Action, former TrueCar employees confirmed that the Individual Defendants were aware of this decline, as they were able to witness these declining metrics in "real time" via multiple internal Company databases.  Class Complaint ¶ 9. Additionally, all USAA member complaints were routed internally to the Company's "Escalation Department," located at TrueCar's headquarters in Santa Monica, California. *Id.* Indeed, the Individual Defendants would later admit that they had witnessed the significant USAA shortfall immediately after the website changes were implemented, which, according to a former TrueCar employee, prompted a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company-wide "fireside" meeting attended by defendant Chip Perry, TrueCar's CEO, discussing the sharp downturn in USAA traffic. *Id.*

9.     On July 17, 2017, TrueCar's stock price climbed to its peak of $21.75 per share, over 60% higher than its price at the beginning of the relevant time period. Approximately one week later, on July 26, 2017, just one day after the Lock-Up Period expired, defendants Guthrie and Pierantoni and other Company insiders began selling enormous amounts of their TrueCar stock. These insiders collectively sold nearly 1 million TrueCar shares, realizing approximately $19 million in gross proceeds in the week following expiration of the Lock-Up Period.

10.     The largest seller was TrueCar's Chief Financial Officer ("CFO"), defendant Guthrie, who sold more than 730,000 TrueCar shares, or 54% of his total holdings, and realized nearly $14 million in ill-gotten gains. Guthrie's sales contrasted sharply with Defendant Guthrie's prior trading history, which was non-existent. Defendant John Pierantoni, TrueCar's Chief Accounting Officer, also sold substantial amounts of his TrueCar stock, amounting to 50% of his total holdings, realizing $1.2 million in gross proceeds. Heavy insider selling continued through October 2017, just before the truth about the USAA website changes was revealed, including by directors Krafcik, Buce, Dietz and Yadigaroglu. In total, insiders sold more than 1.1 million TrueCar shares between February 16, 2017 and November 6, 2017 and received in excess of $21 million in gross proceeds.

11.     On November 6, 2017, when the Company released its earnings for the third quarter ended September 30, 2017, the Individual Defendants were forced to reveal the truth. TrueCar reported that, rather than experiencing record unit growth in excess of 20%, the Company's sales units attributable to USAA had declined by 5%, meaning the Company could not meet the guidance it had issued only three months prior. To the surprise of investors, defendant Chip Perry admitted for the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

first time that this shortfall was solely attributable to substantial changes USAA had made to the cobranded car buying website with TrueCar months ago which Perry conceded were so extensive they amounted to a "significant website redesign," causing "a decline in traffic, prospects, and units on USAA." Perry admitted that TrueCar "saw [these] changes coming," stating: "It wasn't like we were blind to them."

12.    On this news, the Company's stock dropped precipitously, falling over 35%, or $5.76 per share, in a single day, to close at $10.58 per share on November 7, 2017 on heavy trading volume.

13.    The Individual Defendants' wrongful conduct has significantly and materially harmed TrueCar. By virtue of the Individual Defendants' breaches of fiduciary duties, the Company is a defendant in the Securities Class Action for which it will expend substantial resources to defend itself and satisfy any judgment obtained therein and TrueCar has also suffered significant disruption of, and damage to, its business, its reputation and goodwill. Moreover, the insider sellers must disgorge any profits they earned to TrueCar, in accordance with Delaware law.

14.    As a result of the misconduct described herein and the recent ruling in the Securities Class Action, a majority of the current members of TrueCar's Board are antagonistic to this lawsuit such that making a demand on the Board would be futile. Seven of the nine current directors are defendants in an upheld action alleging fraudulent misconduct, rendering demand futile under *Pfeiffer v. Toll*, 989 A.2d 683, 690 (Del. Ch. 2010)(reversed on other grounds). Moreover, each of the Individual Defendants faces a substantial likelihood of non-exculpated liability for their breaches of fiduciary duty disabling the current Board members from impartially considering the subject matter of this lawsuit. Finally, the directors would not

authorize an insider trading claim against USAA as proving such a case would expose their own wrongdoing, and establish their own liability.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) insofar as this action arises under sections 10(b) and 21D of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

16.     Prior to Congress having enacted an express provision for contribution under section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5. *See Musick, Peeler Garrnett v. Employers Ins. Of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim.

17.     This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

18.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

19.     This Court has personal jurisdiction over each defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## PARTIES

21.    Plaintiff is a shareholder of TrueCar, was a shareholder of TrueCar at the time of the wrongdoing alleged herein, and has been a shareholder of TrueCar continuously since February 2017.

22.    Nominal Defendant TrueCar is an internet-based automotive company that purports to offer users market pricing on new and used cars, and connects users with its network of "TrueCar Certified Dealers." TrueCar is a Delaware corporation, headquartered at 120 Broadway, Suite 200, Santa Monica, California 90401. As of December 31, 2016, TrueCar had 650 employees, with the majority located at the Company's main offices in Santa Monica and San Francisco, California, and Austin, Texas.

23.    Defendant Victor "Chip" Perry ("Perry") has served as the Chief Executive Officer and President of TrueCar, as well as a member of the Company's Board, since December 2015. Perry replaced TrueCar's founder, Scott Painter, who announced his resignation as CEO in August 2015 after the Company experienced a mass exodus of dealers from its network. Defendant Perry caused and/or allowed the Company to make materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 16, 2017, February 28, 2017, May 9, 2017, August 8, 2017, and September 7, 2017. Defendant Perry also reviewed, approved and signed and certified TrueCar's quarterly and annual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in connection with the Company's April 26, 2017 common stock secondary offering ("the Secondary Offering"),[4] which contained materially false and misleading statements and omissions. Perry is a named defendant in the Securities Class Action.

24.     Defendant Michael Guthrie ("Guthrie") served as TrueCar's Chief Financial Officer from January 2012 through January 28, 2018, when he suddenly resigned for "personal reasons," and served as Interim Chief Operating Officer from September 2015 until December 2015. Defendant Guthrie caused and/or allowed the Company to make materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 16, 2017, May 9, 2017, August 8, 2017, and September 7, 2017. Defendant Guthrie also reviewed, approved and signed and certified TrueCar's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in connection with the Offering, which contained materially false and misleading statements and omissions. Guthrie is a named defendant in the Securities Class Action.

25.     Defendant John Pierantoni ("Pierantoni") served as the Company's Chief Accounting Officer from 2013 until February 1, 2018, when Pierantoni became interim CFO of TrueCar. Defendant Pierantoni reviewed, approved and signed TrueCar's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in connection with the Offering, which contained

---

[4] The Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3, dated January 19, 2017 and declared effective on February 6, 2017 (the "Registration Statement"); a Prospectus filed with the SEC, dated January 19, 2017 (the "Prospectus"); and a Prospectus Supplement filed with the SEC, dated April 26, 2017 (the "Prospectus Supplement," and, together with the Registration statement and the Prospectus, the "Offering Documents").

materially false and misleading statements and omissions. Pierantoni is a named defendant in the Securities Class Action.

26.     Defendants Perry, Guthrie and Pierantoni (the "Officer Defendants") – along with TrueCar's General Counsel, non-defendant Jeffrey Swart, who chaired the committee with defendant Pierantoni, were all members of TrueCar's "Disclosure Committee" during the relevant time period. The Disclosure Committee met "prior to the filing of each quarterly and annual report" between February 16, 2017 and November 6, 2017, and, according to its charter, was tasked with ensuring the overall accuracy of the Company's public filings and conducting "periodic inquiries with relevant Company personnel possessing information potentially requiring disclosure."

27.     Defendant Abhishek Agrawal ("Agrawal") served as a member of the Company's Board since November 2013, but did not stand for re-election at the 2017 annual meeting. Agrawal, at all relevant times was a Managing Director at Vulcan Capital Growth Equity, LLC.  In the 2017 Secondary Offering, Vulcan sold 1,134,923 TrueCar shares. Agrawal is a named defendant in the Securities Class Action.

28.     Defendant Robert Buce ("Buce") has served as a member of the Company's Board since April 2005. Additionally, Buce served as the Executive Vice President and Chief Financial Officer of True Car from September 2005 to September 2008. Buce also serves as Chairman of the Company's Audit Committee and is a Certified Public Accountant (inactive) in the State of California. Buce is a named defendant in the Securities Class Action.

29.     Defendant Christopher Claus ("Claus") served as a member of the Company's Board since April 2014 and as Chairman of the Board since February 2016. He is also a member of the Company's Audit Committee and the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Compensation & Workforce Committee ("Compensation Committee"). From December 1994 to March 2014, Claus served in various senior executive roles at USAA, including Executive Vice President of USAA Enterprise Advice Group and President of USAA Financial Services Group. Previously, he served as the Senior Vice President and then President of USAA Investment Management Company and Vice President of Investment Sales and Services. From January 2009 through the present, Claus was and still is a member of the board of directors of USAA Real Estate Company, and he represented USAA's interests on the Board. Claus is a named defendant in the Securities Class Action.

30.     Defendant Steven Dietz ("Dietz") served as a member of the Company's Board from February 2006 through his retirement in October 2018 and was the Board's second-longest serving member. Entities with which defendant Dietz was affiliated sold at least 1.32 million shares in the 2017 Secondary Offering. Dietz is a named defendant in the Securities Class Action.

31.     Defendant John Krafcik ("Krafcik") has served as a member of the Company's Board since February 2014. Krafcik also served as TrueCar's President from April 2014 until September 2015. Krafcik is a named defendant in the Securities Class Action.

32.     Defendant Erin Lantz ("Lantz") has served as a member of the Company's Board since November 2016. Lantz also serves as a member of the Company's Audit Committee and its Nominating and Corporate Governance Committee ("Governance Committee"). Lantz is a named defendant in the Securities Class Action.

33.     Defendant Wesley Nichols ("Nichols") has served as a member of the Company's Board since November 2016. Nichols also serves as a member of the

Company's Governance Committee and Chairman of the Compensation Committee. Nichols is a named defendant in the Securities Class Action.

34.     Defendant Ion Yadigaroglu ("Yadigarolu") has served as a member of the Company's Board since August 2007. Yadigaroglu also serves as a member of the Company's Governance Committee. Entities with which defendant Yadigaroglu was affiliated sold 509,459 shares in the 2017 Secondary Offering. Yadigaroglu is a named defendant in the Securities Class Action.

35.     Defendant John Mendel ("Mendel") has served as a member of the Company's Board since May 17, 2017. Mendel also serves as a member of the Company's Governance Committee. Mendel has not been named as a defendant in the Securities Class Action

36.     Defendant Unites States Automobile Association ("USAA"), is an unincorporated association, with offices at 9800 Fredericksburg Road, San Antonio, TX 78288. As of February 28, 2017, USAA and affiliates beneficially owned 12,175,335 shares of TrueCar stock, representing a 13.9% stake, and making USAA TrueCar's largest shareholder. USAA sold over 3.1 million shares in the 2017 Secondary Offering.

37.     The defendants identified in ¶¶ 27 – 35 and ¶ 23 above (collectively, the "Director Defendants"), along with non-defendant Phil McKoy constitute all of the current directors on TrueCar's Board. The Officer Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants." Defendants Guthrie, Pierantoni, Dietz, Yadigaroglu, Buce and Krafcik are sometimes collectively referred to herein as the "Insider Selling Defendants").

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

38.     By reason of their positions as officers, directors and/or fiduciaries of TrueCar and because of their ability to control the business and corporate affairs of

the Company, the Individual Defendants owed TrueCar and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage TrueCar in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of TrueCar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

39.    Each director and officer of the Company also owes to TrueCar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of TrueCar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with TrueCar, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper practices of TrueCar.

41.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of TrueCar, and was at all times acting within the course and scope of such agency.

42.    To discharge their duties, the officers and directors of TrueCar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company. By virtue of such duties, the officers and directors of TrueCar were required to, among other things:

a.    refrain from acting upon material inside corporate information to benefit themselves;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

b.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

c.      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.      remain informed as to how TrueCar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

e.      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

43.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of TrueCar, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the relevant time period has been ratified by the remaining Individual Defendants who collectively comprised all of TrueCar's Board during the relevant time period.

44.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misrepresent its business, operations and prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct by causing the Company to conceal the true facts as alleged herein.

46. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and breaches of fiduciary, to conceal adverse information concerning the Company's operations, financial condition and future business prospects, and to artificially inflate the price of TrueCar common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

47. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective internal control policies and procedures with respect to the Company's public statements to its shareholders and the investing community. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of

the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of TrueCar, and was at all times acting within the course and scope of such agency.

# FACTUAL ALLEGATIONS

## BACKGROUND OF TRUECAR

50.     TrueCar is a web-based company offering a "digital automotive marketplace" that promises to provide consumers with the "TruePrice," or actual market price, of new and used cars. TrueCar allows consumers to search for the make and model of the car they want, obtain market pricing data, and then connect with TrueCar's network of Certified Dealers so that consumers can purchase their desired car for a guaranteed price below the car's manufacturer's suggested retail price ("MSRP"). TrueCar runs this platform both on its own branded website (TrueCar.com) and on customized co-branded websites with "affinity group marketing partners," which include financial institutions, membership-based organizations, and employee buying programs for large enterprises.

51.     TrueCar monetizes its business through fees paid to the Company from Certified Dealers for each "unit," or car, sold through the site. As explained in the Company's SEC filings, "units" are "the number of automobiles purchased by our users from TrueCar Certified Dealers through TrueCar.com . . . or the car-buying sites we maintain for our affinity group marketing partners." Certified Dealers either pay TrueCar a fee per each vehicle sold through TrueCar ($299 for new cars and $399 for used cars), or pay a subscription fee based on the actual number of cars sold through TrueCar. During the relevant time period, almost all of TrueCar's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

revenues (approximately 94%) were generated by unit sales. Accordingly, TrueCar states in its SEC filings that "[w]e view units as a key indicator of the growth of our business."

52.    TrueCar's SEC filings emphasize that its affinity partnerships, which are responsible for the "majority" of the car sales through its site, are "critical" to its unit growth and therefore its financial performance. For example, the Company's SEC filings state:

> Our financial performance is substantially dependent upon the number of automobiles purchased from TrueCar Certified Dealers by users of the TrueCar website . . . Currently, a majority of the automobiles purchased by our users were matched to the car-buying sites we maintain for our affinity group marketing partners. As a result, our relationships with our affinity group marketing partners are critical to our business and financial performance.

53.    Throughout the relevant time period, the most important of TrueCar's affinity partnerships by far was with USAA, the Company's largest shareholder and longest-standing affinity partner that generated nearly one third of TrueCar's annual units and revenues in 2016.

## TRUECAR WAS HIGHLY RELIANT ON USAA WHICH WAS ITS LARGEST AFFINITY PARTNER AND LARGEST SHAREHOLDER

54.    Prior to and during the relevant time period, TrueCar was highly dependent on USAA, which played a significant role in directing TrueCar's business. As one analyst stated, USAA was "absolutely pivotal to [TrueCar's] beginnings, opening doors to dealerships at inception." Indeed, USAA has been TrueCar's largest shareholder since before it became a public company. TrueCar was the first investment of USAA Ventures, a program USAA developed in 2010 for start-up investing. USAA continued to own in excess of 25% of TrueCar up until its

19

initial public offering in 2014. At the outset of the relevant time period, USAA remained the Company's largest shareholder, owning approximately 14% of TrueCar's common stock.

55.    USAA has also always had representation on TrueCar's Board. From May 2012 through April 2014, the USAA Board representative was Vic Pascucci, head of Corporate Development at USAA and of the USAA Ventures program. When Pascucci resigned in April 2014, Christopher Claus replaced him as the USAA representative on TrueCar's Board. As stated by the Company's press release announcing Claus' appointment to the Board, Claus had a "distinguished 20-year career at USAA," holding "several senior financial and operating roles" through March 2014, "serving as the president of the Financial Advice and Solutions Group and as a member of USAA's Executive Council for 13 years." While not mentioned on TrueCar's website or in its SEC filings, Claus has also served as a Director of the USAA Real Estate Company, the "real estate investment arm of USAA," according to USAA's website, from 2009 through the present day. Significantly, Claus not only served on TrueCar's Board as the USAA representative, he was elected Chairman of the TrueCar Board in February 2016, and served in that role throughout the relevant time period up to the present day.

56.    USAA is also TrueCar's most significant affinity partner, and has been since its inception. As stated in TrueCar's SEC filings: "The largest source of user traffic and unit sales from our affinity group marketing partners comes from the site we maintain for USAA." According to TrueCar's 2016 Form 10-K, USAA generated 32% of TrueCar's annual revenues that year, meaning 32% "of all units purchased by users from TrueCar Certified Dealers . . . were matched to users of the car-buying site [TrueCar] maintain[s] for USAA." The 2016 Form 10-K stated that, for this reason, "USAA has a significant influence on our operating results."

57. While the Company's SEC filings stated that USAA had "broad discretion in how the car buying site . . . [was] promoted and marketed on its own website," significantly, TrueCar was responsible for "maintain[ing]" the co-branded site—*i.e.*, it hosted, managed and operated the car buying site for USAA. This meant that any changes USAA made to the car buying site would necessarily require TrueCar's involvement in order to implement them. Additionally, because of USAA's critical importance to TrueCar's financial success, TrueCar's most senior executives, including defendant Perry, had direct involvement in this task. For example, defendant Perry stated during the Company's November 3, 2016 3Q earnings call just prior to the relevant time period that he personally worked with "USAA's most senior executives and the team assigned to the day-to-day management of their car buying service":

> One of the key differentiators that I always admired about TrueCar before I joined was the company's powerful affinity network. USAA is simply the perfect partner for our business because of the scale and loyalty of their members . . . I have had the good fortune of working with some of USAA's most senior executives and the team assigned to the day-to-day management of their car buying service, and I'm excited about where we can take this partnership.

58. According to allegations in the Securities Class Action, former TrueCar employees further confirmed that TrueCar's senior management worked closely with USAA on a "daily" basis. *See* Class Complaint ¶ 32. The Class Complaint references Confidential Witnesses[5] as follows:

---

[5] Former TrueCar employees are referred to in the Class Complaint as Confidential Witness "CW __" and, according to the Class Complaint, are referenced in the feminine form to maintain their confidentiality.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

For example, Confidential Witness ("CW") 1, a Consumer Support Specialist in the Company's Austin, Texas offices from March 2015 through March 2017 witnessed, on multiple occasions, senior TrueCar management "walking the room" with USAA representatives. TrueCar's Austin office was its largest office outside of California, housing approximately 20% of the Company's 650 employees, including Brian Skutta, Executive Vice President of Dealer Sales and Service, and Bernie Brenner, TrueCar co-founder and Executive Vice President of Business Development and Strategy. That office was also located only approximately one hour from USAA's headquarters in San Antonio, resulting in extensive interaction between USAA and TrueCar executives. Indeed, CW 1 stated that she observed Brenner in particular meeting with USAA representatives at least five separate times in 2016-2017. She also observed Wendy Tanner, former Vice President of Dealer and Consumer Support at TrueCar, interacting with USAA personnel on several occasions.

Class Complaint ¶ 32.

CW 2, a former Senior Partner Development Manager for TrueCar from February 2016 through August 2016 in the Company's Santa Monica headquarters who managed over 180 of TrueCar's affinity partnerships, also confirmed that TrueCar had "daily" contact with USAA. CW 2 stated that David Pributsky and Shane Stephens, an Executive Vice President and Vice President, respectively, in TrueCar's Partner Development department, were the primary contacts at TrueCar with USAA. Megan Lotay, also in Partner Development, worked on the USAA account at TrueCar as well, before leaving in April 2017 to become an Executive Director at USAA. CW 2 stated that Pributsky was based in the Company's offices in Santa Monica and reported to Defendant Perry, while Stephens, Pributsky's direct report, was based in the Company's Austin, Texas offices. CW 2 stated that, according to her Partner Development team members, Stephens spent at least 75% of his time at USAA's headquarters in San Antonio, Texas.

Class Complaint ¶ 33.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> CW 3, a former Technical Product Manager for TrueCar in the Company's Austin, Texas offices from November 2015 through June 2017, shared a work space close to Stephens, the Vice President in Partner Development who was responsible for the USAA account. CW 3 learned through direct conversations with Stephens, who reported to Pributsky in Santa Monica, California that Stephens spent at least 75% of his time at USAA's headquarters in San Antonio, Texas. CW 3 recalled that, on multiple occasions, Stephens stressed to CW 3 the importance of the USAA account and Stephens' required presence at USAA headquarters.

Class Complaint ¶ 34.

59.   The Services & Maintenance Agreement governing TrueCar's management of the car buying website for USAA, publicly filed with the SEC in 2014 (the "Services Agreement"), further showed the degree to which the two companies were intertwined. For example, the Services Agreement required TrueCar to provide USAA with a "full-time program manager" who would be dedicated to overseeing maintenance of the car buying site. USAA also gave specific directions concerning the conduct and quality of TrueCar employees who would be interacting with USAA members in connection with the car buying site, requiring TrueCar to (i) conduct regular drug tests on "each employee that will provide [s]ervices on USAA's premises unescorted by USAA;" (ii) direct TrueCar employees working on the site to comply with USAA's policies while on USAA's premises (including dress code and various detailed security policies); (iii) require TrueCar employees to attend orientation programs conducted by USAA on USAA's premises before performing any services on the car buying site; and (iv) conduct "thorough background check[s] on any [TrueCar] [e]mployees who will have access to [USAA member] [d]ata" prior to the employee performing any services on the site.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Additionally, any subcontractors used by TrueCar who would have access to USAA member data or USAA computing systems had to be "pre-approved by USAA."

60.     The Services Agreement also provided that TrueCar would maintain a call center at its Austin, Texas offices to respond to questions from USAA members about the car buying site. The Services Agreement granted USAA full control over how the Austin call center would be operated. For example, it stated that TrueCar would (i) utilize specific call scripts, subject to approval and changes by USAA, to use for calls with USAA members; (ii) submit a written "Calling Plan" to be approved by USAA detailing the allowed days and timeframes for calling USAA members; (iii) answer 80% of USAA members' calls within 30 seconds with a live voice; (iv) provide monthly "scorecards" to USAA showing, among other things, how fast calls were answered; (v) track, log, and escalate all USAA member complaints to USAA on a monthly basis; and (vi) maintain a quality monitoring program for calls with USAA members. Moreover, TrueCar was required to provide USAA with physical access to TrueCar's call center facilities "on both a scheduled and non-scheduled basis to monitor performance." TrueCar was also required to allow USAA to "audit training sessions" for TrueCar employees and allow USAA to provide "culture training" to TrueCar employees who interacted with USAA members.

61.     In light of USAA's "broad discretion" over the car buying site, including how it was managed and promoted to USAA members, and USAA's critical contribution to TrueCar's annual units and revenues, TrueCar's SEC filings prior to the relevant time period stated that "[c]hanges in [USAA's] promotion and marketing [of the car-buying site] have in the past and may in the future adversely affect the volume of user traffic we receive from USAA," which "could adversely affect our business and operating results in the future." Those filings also stated that

if USAA were to use its broad discretion to change the car buying website in a way that "de-emphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed. Notably, the filings stated that such harm had occurred in the past as a result of even minor changes USAA had made to the car buying website, namely a prior adjustment to "the location and prominence of the links to [TrueCar's] platform on [USAA's] web pages":

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members. For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform. Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed.

62.   Although TrueCar had numerous affinity partners, USAA was the only affinity partner for which TrueCar made these specific warnings in its SEC filings, which were included in a "Risk Factor" heading devoted solely to USAA. Such statements underscored USAA's material influence on the Company's success, as well as the substantial financial harm TrueCar would incur as a result of any adverse change USAA may make to TrueCar's co-branded car buying website.

**IN EARLY 2017, TRUECAR'S KEY RISK PERTAINING TO USAA MATERIALIZED: USAA IMPLEMENTED SIGNIFICANT CHANGES TO THE CO-BRANDED CAR BUYING WEBSITE**

63.   In or around January 2017, the risks pertaining to USAA that TrueCar set forth in its SEC filings materialized. According to the Securities Class Action, numerous former TrueCar employees confirmed that, by January 2017, USAA had

informed TrueCar that it had significantly redesigned the co-branded car-buying site, and that the changes – which would require USAA members to answer a multitude of additional questions about their personal finances before being able to access the TrueCar car buying site – would be implemented by June 2017. Class Complaint ¶ 39. This news prompted TrueCar to direct management in each of its departments Company-wide to conduct internal meetings with their staff to inform them of the USAA website redesign, and to prepare them for what the Individual Defendants knew the negative impact of such dramatic changes to the car-buying website would be: as acknowledged in the Company's own SEC filings, TrueCar's revenue, business and financial results would be materially and inevitably harmed. *Id.*

64.    As detailed by Confidential Witnesses in the Securities Class Action, knowledge of the site redesign was widespread within TrueCar as was its anticipated negative impact on the Company's business:

> CW 1, a former Consumer Support Specialist at TrueCar from March 2015 through March 2017 who was responsible for helping customers purchase cars through TrueCar's car buying site with USAA, described how, in late January 2017, she and numerous staffers from TrueCar's Consumer Support department were specifically informed by TrueCar's Consumer Support management during an internal meeting that USAA had decided to significantly redesign the co-branded car buying site, and that such redesign would cause a dramatic negative impact on the Company's business.

Class Complaint ¶ 40.

> The meeting occurred at the Company's Austin, Texas office, where CW 1 was based, and which primarily handled customer service and sales for TrueCar's affinity clients, including USAA. Indeed, according to USAA's Services Agreement with TrueCar, the call center at the Company's Austin office was devoted to responding to calls from TrueCar customers who

were USAA members. Additionally, and as set forth above, Brian Skutta, the Executive Vice President of Dealer Sales and Services at TrueCar, and Bernie Brenner, co-founder of TrueCar and Executive Vice President of Business Development and Strategy—including the management of TrueCar's affinity partnerships—were based in the Company's Austin, Texas office.

Class Complaint ¶ 41.

According to CW 1, the meeting was led by Adrienn Colbert and Michelle Brazil, Consumer Support "Team Leads" at TrueCar who were responsible for guiding and monitoring the Consumer Support staffers in their dealings with USAA members. Brandie Aldrich, former Senior Manager of Consumer Support at TrueCar and to whom Colbert and Brazil reported, also attended the meeting. Aldrich reported to Wendy Tanner, former Vice President of Dealer and Consumer Support, who reported to Paul Edmonds, Senior Vice President of Dealer Marketing and Operations, who reported to Defendant Perry. CW 1 recalled that other attendees included, among others, Consumer Support staffers Janey James, Edgar Sanchez, Patrice Love, Raymond Gonzales, and CW 4.

Class Complaint ¶ 42.

At the meeting, Colbert and Brazil informed Consumer Support staffers that USAA had decided to significantly redesign the car buying website with TrueCar by requiring USAA members to answer a series of additional questions pertaining to their personal budgets and finances before they could access the car buying site. CW 1 recalled that the particular changes USAA had decided to implement were shown via a "slide" or "presentation" providing specific "examples" of the questions that USAA would add, and that handouts were also provided. "They (Colbert and Brazil) showed a mock of what the types of questions would look like." Colbert and Brazil explained that TrueCar "was informed by USAA of the change," which USAA hoped would "match them [USAA members] better for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

what the member makes [earns]" and "push USAA members to use [USAA's] credit union for financing."

Class Complaint ¶ 43.

Significantly, CW 1 recalled that a main focus of the January 2017 meeting was to prepare Consumer Support staffers for the known negative impact USAA's significant changes to the car buying site would have on TrueCar's customers and business. In particular, CW 1 stated that it was understood by CW 1 and stated by others at the meeting, including senior managers, that the USAA website changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line. CW 1 stated that this was because the additional steps USAA was adding, and the nature of the questions, were going to deter USAA members from wanting to continue to use the car buying site. CW 1 recalled that Colbert and Brazil stated at the meeting that USAA members would resist the additional questions, which would require USAA members to disclose "sensitive and personal" financial information, causing web traffic to "run slower." CW 1 stated that Colbert and Brazil commented: "People [USAA members] are going to be upset [about the changes]. Don't be surprised when you start receiving more calls [from USAA members]." In fact, CW 1 stated that Consumer Support staffers were provided with specific templates (called "Call Flow Sheets") that were designed to address sample complaints that were expected to be raised by USAA members in response to the changes. The staffers were told to submit these reports online via the "Call Flow Sheets" to Colbert and Brazil, who would in turn forward them to the Company's Escalation Department, headed by Chad Cravens, at TrueCar's headquarters in Santa Monica. Colbert and Brazil stated that TrueCar was "going to go through some rough times, but USAA is our biggest customer and we have to obey," as TrueCar could not "afford to lose the account."

Class Complaint ¶ 44.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Significantly, CW 1 stated that this was not the only internal meeting held at TrueCar about USAA's significant redesign of the car buying website. Rather, there were "numerous" internal meetings taking place in or around January 2017 in which management from each department informed their staffers of the significant changes USAA was making to its car buying website with TrueCar.

Class Complaint ¶ 45.

CW 4, another former TrueCar Consumer Support Specialist in the Company's Austin, Texas offices from December 2015 through mid-November 2017, provided an independent account corroborating the timing and substance of the internal meeting attended by CW 1. CW 4 stated that, in early 2017, Colbert and Brazil, who were Consumer Support Team Leads, informed her and other Consumer Support staffers at an internal meeting at the Company's Austin, Texas office that USAA had decided to implement significant changes to its website later that year, and that those changes would consist of additional questions to USAA members about their personal budgets. CW 4 likewise stated that it was generally understood at this meeting that these changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line.

Class Complaint ¶ 46.

Significantly, CW 4 explained that because USAA is a vital customer for TrueCar and "dictates our company," USAA controlled TrueCar customer support procedures for USAA members. CW 4 stated that, as a result, at the meeting led by Colbert and Brazil—and as also described by CW 1— Consumer Support staffers were provided with a "template," or "Call Flow Sheet," that they were instructed to follow for expected USAA member complaints in response to the USAA website redesign. Colbert instructed Consumer Support staffers to "make sure you are careful (when dealing with upset USAA members)" and "stick to the script" that was provided.

Class Complaint ¶ 47.

> CW 5, another former Consumer Specialist for TrueCar in the Company's Austin, Texas offices from November 2015 through November 2017, also independently corroborated the internal meetings described by CW 1 and CW 4. CW 5 stated that, around early February 2017, Sigourney Samaripa, the Consumer Support Team Lead for CW 5's team and who was also a USAA member, informed CW 5 of USAA's significant redesign of the car buying website, and also informed her of the precise changes that USAA was making—namely, requiring USAA members to answer a series of additional questions pertaining to USAA members' monthly expenses and details about car ownership. Through conversations with Samaripa and Colbert, CW 5 learned of the meeting that had taken place earlier that year in which Colbert and Brazil issued warnings to Consumer Support staffers on the expected negative response from USAA members in connection with USAA's changes to the car buying website. CW 5 also believed that an email had been circulated to Consumer Support staffers by the Team Leads informing them of the same. CW 5 stated that "it was clear from the beginning" thatthe USAA's website changes were "intrusive" to USAA members and "would not be good" for TrueCar.

Class Complaint ¶ 48.

65. According to the Securities Class Action, former employees also confirmed that, on the technological side, TrueCar would have been informed of any changes to the car buying website it maintained for USAA months before those changes were "made live:"

> CW 2, a former Senior Partner Development Manager at TrueCar's offices in Santa Monica from February 2016 through August 2016 who managed over 180 affinity partner relationships at TrueCar, stated that—based on her attendance at bi-weekly and monthly Partner Development team meetings at TrueCar's Santa Monica offices led by Pributsky, who

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> managed the affinity relationship with USAA—TrueCar's creative team worked closely with USAA on the car buying site, and would have been involved in any process to change the site since it was "owned and operated by TrueCar." CW 2 further stated that the significant changes to the website that USAA implemented here—i.e., adding several additional pages to the car buying process consisting of questions requiring data input from users—would have taken at least "months to add," and would have required countless meetings and "lots of testing before it was made live" so both parties could give input.

Class Complaint ¶ 49.

> Indeed, CW 6, a former Software Engineer for TrueCar's mobile apps who worked in the Company's Austin, Texas offices from November 2015 through March 2018, stated that Marco Santini, his supervisor and current Senior Director of Development at TrueCar, attended "numerous meetings" with individuals from USAA throughout early to mid-2017. Santini reported to Chris Denend, Senior Vice President of Software Engineering who was based in the TrueCar's Santa Monica offices, who reported to Tommy McClung, current Chief Technology Officer, who reported to Defendant Perry.

Class Complaint ¶ 50.

66. Moreover, as members of TrueCar's Disclosure Committee, defendants Perry, Guthrie and Pierantoni knew USAA had decided to significantly change the co-branded car buying website because they were required to inform themselves of any such material change. The Company's Disclosure Committee met "prior to the filing of each quarterly and annual report" in order to ensure the accuracy of TrueCar's public filings. Notably, the Disclosure Committee charter expressly required the Officer Defendants to conduct "periodic inquiries" with Company personnel to determine whether they possessed any information requiring disclosure. Such inquiries would have necessarily involved conversations with Company

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

personnel who managed TrueCar's affinity partnership with USAA, which, as set forth above, was critical to TrueCar's success and accounted for nearly one-third of the Company's revenues. Thus, prior to each of the Company's public filings after January 2017, defendants Perry, Guthrie and Pierantoni were required to inform themselves of USAA's significant redesign of the car buying website, and to actively discuss the material impact it would have on TrueCar's business during each of their Disclosure Committee meetings held throughout the relevant time period.

67.    Likewise, while all of the Director Defendants would have been informed of the particular risks regarding TrueCar's affinity partnership with USAA given its significance to the Company, defendants Buce, Claus and Lantz who served on the Audit Committee, were uniquely positioned as a result of their responsibilities related to "Risk Assessment and Risk Management" as required by the Audit Committee Charter in effect during the relevant time period. Additionally, these defendants would have reviewed all earnings press releases and earnings guidance along with the Company's annual audited and quarterly unaudited financial statements on Forms 10-K and 10-Q as required by the Audit Committee Charter in effect during the relevant time period.

68.    Despite these facts, the Individual Defendants never told investors about USAA's "significant website redesign" during the relevant time period, and did not cause TrueCar to change the risk language in the Company's subsequent SEC filings to inform investors that this previously potential and highly significant risk had come to fruition. Instead, the Individual Defendants caused or allowed the Company to continue giving investors the exact opposite impression as if nothing about the USAA partnership had changed: that no such risk had materialized, and that the Company's affinity partnership with USAA was poised to generate record

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and accelerating unit and revenue growth for TrueCar in 2017 in excess of 20%, even as the Individual Defendants knew that such growth would not and could not occur. While TrueCar's stock price was artificially inflated by these misrepresentations, defendants Guthrie and Pierantoni sold material amounts of their TrueCar stock, obtaining tens of millions of dollars in proceeds from illegal insider sales as TrueCar's share price peaked in the months before the truth came out.

**THE INDIVIDUAL DEFENDANTS CONCEAL USAA'S WEBSITE CHANGES WHILE REPRESENTING TRUECAR'S AFFINITY PARTNERSHIP WITH USAA AS A KEY DRIVER OF UNIT GROWTH IN 2017**

69.     While, as described *supra*, certain of the Individual Defendants were holding internal meetings to privately inform TrueCar staffers about USAA's significant redesign of the car buying site and the dramatic impact it would have on the Company's units and revenues once it was implemented in June 2017, the Individual Defendants were concealing the same information from investors and causing or allowing the Company to publicly state that the Company would achieve record unit and revenue growth in 2017 because the USAA channel would "absolutely . . . grow and grow nicely."

70.     For example, on the February 16, 2017 Q4 earnings call, the Individual Defendants caused the Company to tout USAA's "record" double-digit unit growth. In response to an analyst question asking what the "bigger drivers of growth [are] here," and specifically whether TrueCar's affinity partnership with USAA would continue to generate growth in 2017, defendant Guthrie stated:

> [W]e want to keep growth going in all of our channels, TrueCar, USAA, and the branded channel, and we see a lot of opportunities to continue growing there . . . [E]very channel grew well this quarter, this past quarter. I think we're optimistic about all of them going into 2017 . . . You look at the USAA channel, we had great growth in the fourth quarter. We had a

33

> record in the month of December. As I said in the call, we're 11 years into the partnership and still think there is just quite a bit that we can do together with our partners at USAA . . . And so, even though that's a very large channel, we still look at the penetration rates there and we know that they're reasonably low . . . So there's much more work to do there.

71. Similarly, at the February 28, 2017 JMP Securities Technology Conference two weeks later, Perry represented that USAA would "absolutely" grow and be a key source of unit growth for TrueCar in 2017:

> So, one of the characteristics of our business is we have a branded business, which is a little over 40% of our unit volume . . . But we also have a partner affinity business, with USAA being our largest partner . . . That affinity channel in the last fiscal year really started to grow pretty substantially . . . And as we look at where the unit growth comes from next year, we absolutely expect all of our channels to grow and grow nicely, TrueCar-branded, USAA.

72. Analysts reacted positively to this news. For example, a Morgan Stanley report entitled: "TRUEly a Good Quarter" stated that "USAA grew 16% y/y, the fastest since 2015. We view these channels as key drivers to profitable growth as they . . . play an outsized role in driving future earnings growth." Craig-Hallum Capital Group LLC issued a report entitled: "TRUE Continues to Exceed Expectations," raising its target price for TrueCar from $14 to $20 per share, and commenting that: "New CEO Chip Perry has overseen a number of changes that appear to have radically changed [TrueCar's] direction, including . . . refocusing on the highly profitable affinity channel." RBC Capital Markets issued a report commenting that the Company's overall unit growth of 19% was its "fastest growth in five quarters," and that its "unique visitor" growth, which measured TrueCar's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

overall web traffic, was expected to be driven by the Company's "key relationship with USAA."

### CERTAIN DEFENDANTS ENGAGE IN SUBSTANTIAL INSIDER SELLING WHILE CONTINUING TO TOUT TRUECAR'S ACCELERATING UNIT GROWTH

73.    While TrueCar's value was artificially inflated as a result of the Individual Defendants' misrepresentations and breaches of fiduciary duty, TrueCar closed a substantial secondary public offering, selling more than a million shares of stock to unsuspecting investors at inflated prices. Moreover, both defendants Guthrie and Pierantoni, while in possession of material adverse information about TrueCar's actual business and financial condition, engaged in substantial insider sales, realizing tens of millions of dollars in proceeds as TrueCar's stock price climbed toward its peak during the relevant time period.

74.    First, on April 26, 2017, TrueCar conducted a secondary offering (the "Offering") of 10.35 million shares of its common stock at a price of $16.50 per share. In the Offering TrueCar sold 1,150,000 shares, realizing approximately $19 million in proceeds, or just over 10% of the total proceeds from the Offering. USAA and several entities directly affiliated with TrueCar's directors reaped the remaining 90%, amounting to $151.8 million in proceeds.

75.    In particular, USAA sold over 3.1 million of its 12,175,335 TrueCar shares, or 26% of its total TrueCar holdings at the Offering price of $16.50 per share, receiving $51.7 million in proceeds – 34% of the total proceeds from the Offering. Entities affiliated with TrueCar Director Defendants Dietz, Yadigaroglu and Agrawal also sold substantial amounts of TrueCar stock in the Offering as detailed herein. Defendants Perry, Guthrie and Pierantoni did not sell in the Offering because they were subject to a 90-day Lock-Up Period that prevented them from selling any shares until July 25, 2017.

76.   On the May 9, 2017 Q1 earnings call, defendant Guthrie lauded the results of the "successful public offering," and celebrated the Company's accelerating unit growth after its "return[] to double-digit growth rates on units and revenue in Q4 of last year." Specifically, Guthrie represented that TrueCar was "***now generating 20% plus growth on the top-line***," with overall revenue growing 22% and units growing a record 24% compared to the first quarter the prior year.

77.   The Individual Defendants also allowed the Company to raise TrueCar's unit and revenue guidance, while continuing to highlight USAA as a "great grower" for the Company.  As defendant Perry stated:

> So we would, certainly, be remiss if we didn't call out the partner organization of TrueCar over the last few quarters, they had a great first quarter. The unit numbers coming out of our partner channel both USAA, ***which had really healthy growth of 16% in the first quarter, we did 16% in the fourth quarter on a year-over-year basis at USAA, in a year where the growth rate was only 8%. So that's been a great grower for us.***

78.   Contrary to these public statements, in or around June 2017, as USAA had directed months earlier, TrueCar implemented USAA's significant redesign of its co-branded car-buying website with TrueCar. Specifically, as described above, USAA added several additional steps that USAA members would have to complete before being able to access the TrueCar platform, including a series of questions requesting sensitive personal and financial information from members about their credit and monthly budgets.

79.   As detailed in the Securities Class Action and confirmed by former TrueCar employees, the fallout defendants had known would occur once USAA's "significant website redesign" was implemented was almost immediate:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

CW 4, a former TrueCar Consumer Support specialist from December 2015 through mid-November 2017, stated that, by June 2017, she witnessed a spike in USAA complaints specifically relating to the additional questions pertaining to members' personal budgets. These complaints were documented internally and routed to the Company's Escalation Department at TrueCar's headquarters in Santa Monica via the online "Call Flow Sheets."

Class Complaint ¶ 64.

CW 5, another former TrueCar Consumer Support specialist from November 2015 through November 2017, similarly stated that in "early spring" she received a call from a "high ranking" USAA member complaining about "why are they (USAA) now asking all these questions about personal finances," which made the member feel "uncomfortable." CW 5 notified Consumer Support Team Lead Colbert of this complaint via an online "Call Flow Sheet," which CW 5 said Colbert was then responsible for forwarding to the Company's Escalation Department at TrueCar's headquarters in Santa Monica.

Class Complaint ¶ 65.

CW 6, a former TrueCar Software Engineer from November 2015 through March 2018, stated that in early summer 2017, his superior—Marco Santini, the Director of Development at TrueCar—told CW 6's team, which was responsible for development of TrueCar's mobile apps, that "pipeline numbers (for the USAA account) are down." Following this meeting, and leading up to the November 6, 2017 earnings call, CW 6 and other team members received periodic updates from Santini about the USAA account's continued poor performance, which were provided both verbally and through the Company's internal communications system.

Class Complaint ¶ 66.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

CW 7, a former Support Analyst for TrueCar from January 2016 through February 2018, also stated that, within a few weeks of the rollout of the USAA website changes, she witnessed "significantly less traffic" through TrueCar's website due to USAA members opting not to purchase vehicles through USAA/TrueCar.

Class Complaint ¶ 67.

Finally, CW 8, a former Consumer Support Specialist for TrueCar in the Company's Austin, Texas offices from October 2016 through December 2017, stated that, following implementation of USAA's changes to the car buying website— which she stated occurred in "early 2017" – she witnessed a sudden increase in complaints coupled with a reduction in USAA user traffic. Significantly, CW 8 further stated that she attended a "fireside" Company-wide meeting in August 2017, which Defendant Perry attended, discussing the downward trend in user traffic to the USAA car buying website.

Class Complaint ¶ 68.

80. Notably, TrueCar staffers and senior management had "real time" access via internal Company databases to declines in web traffic and sales from USAA members:

Former employees also stated that TrueCar staffers and senior management had "real time" access to declines in web traffic and sales from USAA members via internal Company databases. Specifically, CW 9, a former Director of Trade Operations from February 2017 through March 2018 at TrueCar's office in Austin, Texas, stated that TrueCar leadership – including CW 9 – had real time access to monitor website traffic, leads and sales on affinity partner sites, including the USAA account, via the internal database known as "Dashboard." CW 4 also stated that TrueCar staffers had real time access to this information through "Dashboard." CW 3, a Technical Product Manager for TrueCar from November 2015 through June 2017, similarly stated that "Dashboard" allowed

> TrueCar staffers to monitor in real time the amount of "clicks" and purchases made through the TrueCar car buying website as well as affinity partner sites. Additionally, CW 5 stated that "Turbo System" was another internal database utilized internally at TrueCar that likewise provided "real time" verifications of vehicle purchases by USAA members from TrueCar Certified Dealers.

Class Complaint ¶ 69.

81.     Bolstering allegations made in the Securities Class Action of "real time" access, defendant Guthrie himself had stated, at a May 25, 2017 analyst conference, that TrueCar Certified Dealers gave the Company direct access to their "dealer management software," which showed all car sales at the dealership in real time, including for the Company's affinity partner sites: "What that allows us to do is see every transaction that flows through the dealership. *We know every transaction that comes through either our branded business or through our affinity business*."

82.     On July 17, 2017, when the dramatic decline from the significant USAA website changes was well underway and TrueCar's investors remained unaware, TrueCar's stock peaked at its relevant period high of $21.75 per share, or 64% higher than its price at the beginning of the relevant time period (when the stock closed at $13.24 per share).

83.     Roughly one week later, on July 25, 2017, the 90-day Lock-Up Period which defendants Guthrie and Pierantoni were subject to as part of the April 26, 2017 Offering expired. The day after its expiration, defendants Guthrie and Pierantoni began selling substantial amounts of their TrueCar stock which was still trading near its relevant period high (between $19-$21 per share), along with Company officers Neeraj Gunsagar (CMO) and Jeffrey Swart (General Counsel). Collectively, within the week after the Lock-Up Period expired, these Company

1  officers sold nearly 1 million TrueCar shares and collected approximately $19

2  million in gross proceeds.

3      84.    A graph set out in the Class Complaint details the timing of these sales

4  and the corresponding share price:



17  Class Complaint ¶ 72.

18      85.    Defendant Guthrie, the Company's CFO who was in charge of

19  monitoring TrueCar's unit sales and revenues, was the largest insider seller.  Indeed,

20  Guthrie sold 737,916 of his TrueCar shares – over half of his total holdings (54%) –

21  within days of the Lock-Up Period expiring, realizing nearly $14 million in gross

22  proceeds alone.

| TrueCar Officers Obtain $19 Million in Insider Sales<br>Immediately After Lock-Up Expires | | | |
|---|---|---|---|
| **Insider** | **Date of Sale** | **Shares** | **Gross Proceeds** |
| Guthrie (CFO) | 7/26/17-8/4/17 | 737,916 | $13,962,608 |
| Pierantoni (CAO) | 7/26/17 | 55,895 | $1,107,501 |
| Gunsagar (CMO) | 7/26/17 | 158,160 | $3,051,785 |
| Swart (GC) | 7/26/17 | 34,863 | $690,860 |
| **Total:** | | **986,834** | **$18,812,754** |

Class Complaint ¶ 73.

### THE INDIVIDUAL DEFENDANTS CONTINUE TO MISLEAD THE MARKET ABOUT TRUECAR'S AFFINITY RELATIONSHIP WITH USAA

86.    When the Company released its second quarter results on August 8, 2017 and filed its Form 10-Q on August 9, 2017, the Individual Defendants did not reveal the truth to investors.

87.    Although the USAA had already implemented a "significant website redesign," the Form 10-Q continued merely to warn of the "risk" that if USAA were to change the co-branded car buying site at some point "in the future," the Company's business would be significantly harmed.

88.    Moreover, certain of the Director Defendants, or entities related thereto, continued to unload their shares of TrueCar stock while in possession of material undisclosed information about the website redesign. In total, Yadigaroglu-related entities sold approximately 175,000 shares of stock on August 23, 24, 25 and August 28, 2017, for proceeds of nearly $2.9 million. Defendant Krafcik sold 20,000 shares on August 15 and August 31, 2015 for proceeds of approximately $330,000 and defendant Buce sold 32,999 shares of stock for proceeds of approximately $546,000.

89.    Even though the Individual Defendants would soon admit that USAA's significant redesign of the car buying website had been implemented weeks prior and that they had "really started to see [the USAA shortfall]" as a result of the changes before August 8, 2017, defendant Guthrie claimed on the Company's earnings call that day that TrueCar was currently seeing "continued strong growth in units" in the third quarter that was "really fantastic." Guthrie stated that the Company had embedded this "really fantastic" unit growth in its annual 2017 guidance, which it raised for the second time. The Individual Defendants also cause the Company to issue strong guidance for Q3 2017, with defendant Guthrie representing that the Company would continue to achieve a growth rate in excess of 20% based on what he was "seeing": "[W]e are already seeing signs of high unit growth rates as our July results come in. As a result, we expect Q3 units to be in the range of . . . 20% to 22% year-over-year growth."

90.    In reality, however, the units generated by USAA, which typically accounted for nearly a third of the Company's annual units and revenues, were rapidly and significantly declining.

**THE TRUTH IS REVEALED**

91.    As late as September 7, 2017, only three weeks before the end of the third quarter, the Individual Defendants continued to represent that the Company's unit growth was "in the mid-20% range," stating "units are growing nicely." However, when TrueCar released its third quarter results on November 6, 2017, the Individual Defendants were forced to reveal that USAA's significant changes to the car buying website had profoundly and negatively impacted TrueCar's business, units and revenues. During the third quarter earnings call, and to the surprise of investors, the Individual Defendants caused the Company to announce that, rather than achieving unit growth in the "mid-20% range" in the third quarter as they had

represented, USAA units had declined by 5% in the third quarter, after what defendant Perry described as a "normal sort of growth trend with USAA that we've had for many, many years, double-digit growth, consistently." The Individual Defendants further announced that, despite having raised TrueCar's annual guidance just three months prior, they were now forced to lower that guidance because they would no longer be able to meet it.

92.     Indeed, despite 18 consecutive quarters of growth in excess of 30% in the Company's used car business, in the third quarter, used car units grew only 16%. Defendant Guthrie stated that "[t]he year-over- year contraction in units at USAA contributed to the deceleration in used car growth versus last quarter as our USAA channel has the highest ratio of used car sales."  The Individual Defendants also noted that TrueCar's "unique visitors," which measured its overall web traffic, had fallen to a growth rate of only 1%—as one analyst commented, this was the Company's slowest growth rate in that metric since 2013.

93.     Defendant Perry admitted for the first time that these significant financial misses were a direct result of the fact that USAA had "significant[[ly] [] redesigned" the co-branded car-buying website:

> While I'm generally pleased with our execution in the third quarter, we did have our challenges. Recently, USAA launched a significant website redesign . . . [T]he new USAA Car Buying experience has introduced several new steps in the process and new content related to total cost of [car] ownership before the member is linked to the Car Buying Service powered by TrueCar . . . For Q3 . . . we saw a decline in traffic, prospects and units [for] USAA.

94.     Perry further explained why these "new steps" caused such a sharp decline in USAA user traffic, stating: "[A] feel for affordability was put in front of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

members, and that caused them to pause, perhaps not continue, perhaps come back at a later date." Defendant Guthrie similarly stated:

> If you just look at the numbers and it's really clear, I think we really had [] a traffic issue as Chip [Perry] was saying. Whether very well financially qualified or not, all of the [USAA] members went through an experience that made it much more difficult to get through the car buying service. And so if you look at traffic versus prospects versus units, a very, very large decline in traffic, much smaller in terms of the declines in prospects and only 5% down on units.

95.    Perry also acknowledged that the USAA website changes were known well in advance of their implementation:

> So the changes in the [USAA] user experience involved inserting some steps, questions and also content related to vehicle affordability and cost of ownership. So we saw these coming. It wasn't like we were blind to them.

96.    While Perry claimed that TrueCar and USAA realized the "downward effect on our numbers" only "after we saw [the website changes] launched," this was clearly not true. As TrueCar's own Form 2016 10-K and 2017 Form 10-Qs explicitly stated, if USAA were to change its website in any way – even in a negligible way, such as changing the location of the links to the TrueCar car buying service – "our revenue, business and financial results will be harmed." If such a minor change would harm TrueCar's business, the only logical conclusion is that the impact of a "significant website redesign" on the Company's financial results would be profound, and inevitable. Indeed, as former TrueCar employees' detailed accounts confirm, by January 2017, the significant changes USAA had decided to make to the car buying website were well known within the Company as well as the dramatic reduction in units and revenue, prompting the Company to require every department

1  to hold internal all-hands-on-deck meetings to prepare for the changes and their

2  fallout.

3        97.    Moreover, when an analyst inquired as to "when exactly within the

4  quarter did the USAA shortfall hit the numbers," defendant Guthrie, although

5  claiming the Company had a "pretty good" July, admitted that "[w]e really started to

6  see [the shortfall] in August" – the same month he had told investors during the

7  August 8, 2017 2Q earnings call that "[w]e're seeing, as the third quarter starts,

8  continued strong growth in units." Guthrie also admitted that TrueCar and USAA, as

9  part of their affinity relationship, worked closely together in determining what would

10  occur with regard to the co-branded website, making clear that TrueCar could not

11  have been ignorant to the website changes. Specifically, Guthrie stated: "We don't

12  have any dealings without [USAA's] consent," and "[w]e work with them on a daily

13  basis and we're well-connected."

14        98.    Upon revelation that USAA had implemented a significant website

15  redesign that profoundly reduced TrueCar's unit and revenue growth, the

16  Company's stock plummeted, falling over 35%, or $5.76 per share, in a single day,

17  closing at $10.58 per share on November 7, 2017 on heavy trading volume.

18        99.    In the months after the truth was revealed, the Individual Defendants

19  made several additional public admissions confirming the significance of the launch

20  of USAA's website redesign in mid-2017, and that the changes USAA implemented

21  severely impacted TrueCar's financial results – so much so that the Company's

22  decline in unit growth persisted through the first and second quarters of 2018.

23       100.   For example, at the November 8, 2017 RBC Capital Markets

24  Technology conference, Perry elaborated on why the USAA website changes caused

25  a sharp decline in TrueCar's web traffic and units from USAA, stating they had

26  created considerable "friction" between USAA members and TrueCar:

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> A big chunk of the audience that makes [TrueCar] number one is a flow of car buyers that come from USAA . . . and what they did in the third quarter was put in place a new experience layer on their side related to advising members about what kind of car they should buy and including a lot of [information on] car affordability. So it put some friction that didn't used to exist between us and them.

101.   Not long after TrueCar revealed its difficulties with USAA, on February 1, 2018, TrueCar announced that on January 28, 2018, defendant Guthrie, who had made nearly $14 million off insider sales during the relevant time period, notified the Company that he was resigning as CFO due to "personal reasons."

102.   On February 15, 2018, the Company announced its fourth quarter and full year results for 2017. Significantly, USAA produced only 58,975 units, down 14% from the prior year. In other words, the decline in TrueCar's units attributable to USAA, which prior to the third quarter of 2017 had exhibited double-digit growth for "many years," was now exhibiting double-digit deceleration.

103.   The sharp decline in unit growth persisted through the first and second quarters of 2018, despite USAA's purported efforts to make further changes to the co-branded website in an effort to decrease the "friction" the original changes had caused. Namely, in the first quarter of 2018, TrueCar reported that USAA units were still down 5% from the prior year – *i.e.*, the same percentage decline that had occurred in the third quarter of 2017. Defendant Pierantoni, who assumed the role of CFO after Guthrie's departure, stated at the May 15, 2018 JP Morgan Global Technology conference that this continuing decline was directly attributable to the changes USAA had made to the TrueCar car buying site in mid-2017:

> With respect to the first quarter and why it's a little bit lighter than where it was in the past for last year is in part driven by our USAA partner. USAA is our biggest affinity partner. Last year, they changed their experience with TrueCar and created

some friction in their marketplace which we've subsequently worked through with them.

104.   Additionally, when the Company released its second quarter results on August 9, 2018, defendant Perry reported on the Company's earnings call that USAA units were still "down 5% year-over-year," again due to the USAA website changes in mid-2017. Moreover, overall unit growth was just 3% – well below the consistent double-digit unit growth "in the mid-20% range" the Individual Defendants had touted during the relevant time period.

105.   These events confirm that the USAA website changes were highly material, causing a lasting and significant decline in TrueCar's unit growth and financial results.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

106.   The Individual Defendants caused or allowed the Company to make materially false and misleading statements or omitted to state material facts during the relevant time period causing significant harm to TrueCar. Indeed, the Individual Defendants knew by early 2017 that USAA, the Company's largest source of revenue and "cornerstone for TrueCar's business" was making "significant" changes to their co-branded car buying website that would have a material adverse effect on the volume of purchases generated by USAA and prevent that growth from continuing. The Individual Defendants also knew that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past" even negligible changes, such as "USAA adjust[ing] the location and prominence of the links to [TrueCar's] platform on its web pages," had "adversely affect[ed] the volume of traffic to [the Company's] platform."

107.   As a result of the Individual Defendants' breaches of fiduciary duty and disloyal and/or bad faith acts, the Company made materially false statements that lacked a reasonable basis regarding TrueCar's business, operations, and prospects.

**FOURTH QUARTER AND FULL YEAR 2016**

108.   On February 16, 2017, the Individual Defendants caused the Company to issue a press release announcing strong financial results for the fourth quarter and full year 2016. In the Company's media release, defendant Perry represented that the Company was "re-accelerating our top-line growth while also improving our margins" and would "continue to drive double-digit rates of unit and revenue growth for some time." Defendant Guthrie added that TrueCar had "set the stage for strong growth and margin expansion over the next few years."

109.   Defendant Perry continued to stress TrueCar's continuous growth on the Company's February 16, 2017 fourth quarter earnings call, stating: "At this point, I can say that I am very confident that we now clearly understand and have our hand placed securely on the practical levers that will enable us to continue to drive double-digit rate of unit and revenue growth for some time."

110.   Furthermore, defendant Guthrie, in addition to discussing how USAA sales were at "an all-time high," represented that TrueCar's prosperous relationship with USAA would only continue to grow. Specifically, Guthrie stated that "[a]s we enter our 11th year as partners with USAA, there is still much to do," adding that "we see a lot of opportunities to continue growing there."

111.   Defendant Guthrie, in response to an analyst inquiry regarding the Company's "bigger drivers of growth"—and specifically whether TrueCar's affinity relationship would continue to generate growth in 2017 – defendant Guthrie represented the following concerning TrueCar's partnership with USAA:

. . . You look at the USAA channel, we had great growth in the fourth quarter. We had a record in the month of December. And as I said in the call, we're 11 years into the partnership and still think there is just quite a bit that we can do together with our partners at USAA, to continue to make car buying better and better for their members. And so, even though that's a very large channel, we still look at the penetration rates there and we know that they're reasonably low, both on new car and used car. S there's much more work to do there.

112.    At the JMP Securities Technology Conference on February 28, 2017, defendant Perry reiterated these points, stating: "we also have a partner affinity business, with USAA being our largest partner . . . That affinity channel in the last fiscal year really started to grow pretty substantially . . . And as we really look at where the unit growth comes from next year, we absolutely expect all of our channels to grow and grow nicely, TrueCar branded, USAA."

113.    The statements in paragraphs 108 through 112 above were materially false and misleading and omitted to state material facts. Specifically, USAA was not going to be one of the Company's "bigger drivers of growth" with "opportunities to continue growing there." In reality, USAA had already decided to significantly change its co-branded website with TrueCar with a "significant website redesign" that would adversely affect the Company's financial results. As former employees confirm, by January 2017, TrueCar "was informed by USAA of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar. Notably, as defendant Perry admitted: "we saw these [changes] coming. It wasn't like we were blind to them." Moreover, it was widely known within TrueCar that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of

traffic to [the Company's] platform." In fact, these changes were far more significant than merely changing the location of links to the TrueCar platform. Thus, there was no reasonable basis to attribute future unit growth to USAA.

114. On March 1, 2017, defendants Perry, Guthrie, and Pierantoni caused the Company to file its Form 10-K with the SEC for the year ended December 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K was signed by defendants Perry, Guthrie, and Pierantoni. The 2016 Form 10-K contained certifications signed by defendants Perry and Guthrie.

115. The 2016 Form 10-K described how "a significant reduction in the number of cars purchased . . . by members of [TrueCar's] affinity group marketing partners would reduce [the Company's] revenue and harm [TrueCar's] operating results":

> [S]everal aspects of our relationship with affinity groups might change in a manner that harms our business and financial performance, including: [. . .] affinity group marketing partners might de-emphasize the automobile buying programs within their offerings, resulting in a decrease in the number of transactions between their members and our TrueCar Certified Dealers. [. . .] If our relationships with affinity group marketing partners change our business, revenue, operating results and prospects may be harmed.

116. Further, in describing how "[a]ny adverse change in our relationship with United Services Automobile Association, or USAA, could harm our business," the 2016 Form 10-K stated:

> USAA has broad discretion in how the car-buying site we maintain for USAA is promoted and marketed on its own website. Changes in this promotion and marketing have in the past and may in the future adversely affect the volume of user traffic we receive from USAA. Changes in our relationship with USAA or its promotion and marketing of our platform

50

could adversely affect our business and operating results in the future.

117. The 2016 Form 10-K also specifically represented that if USAA were to use its broad discretion to change the car buying website in a way that "deemphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed:

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members. For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform. Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed.

118. The statements in paragraphs 114 through 117 above were materially false and misleading and omitted to state material facts. Specifically, representations to investors of what would happen if USAA, "the Company's single largest source of unique visitors and unit sales from affinity group marketing partners," were to change its co-branded website "in the future" were materially false and misleading because USAA had already decided to change the co-branded website with a "significant website redesign." The Individual Defendants knew, or disregarded with deliberate recklessness, that fact that these significant changes would "adversely affect [TrueCar's] business and operating results." As former employees confirm, by January 2017, TrueCar "was informed by USAA of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar. As defendant Perry later admitted: "we saw these [changes] coming. It wasn't like we

were blind to them." Moreover, The Individual Defendants knew that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform." In fact, these changes were far more significant than merely changing the location of links to the TrueCar platform. Thus, the Individual Defendants had no reasonable basis to represent that no changes in the Company's relationship with USAA had occurred because they knew of, or disregarded with deliberate recklessness, undisclosed materially adverse facts that seriously undermined the validity of their representations.

**THE APRIL 2017 OFFERING**

119.   On or about April 26, 2017, TrueCar completed the Offering of 10.35 million shares of TrueCar common stock at an offering price of $16.50 per share, generating approximately $170,775,000 million in gross proceeds. In the Offering, USAA sold 2,723,777 of its 12,175,333 beneficially owned shares, reducing its beneficial ownership in the Company from 13.6% to 10.4%. USAA also sold an additional 408,566 shares in connection with the underwriters' exercise in full of their overallotment option to purchase additional shares of common stock.

120.   The Registration Statement for the Offering was signed by defendants Perry, Guthrie and Pierantoni. In the Company's Offering Documents, the Individual Defendants caused the Company to make the same misrepresentations made in the Company's 2016 Form 10-K, as described above in ¶¶ 114-117, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts. These statements continued to be false and misleading for the reasons described above in ¶ 118.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

121.   Additionally, among other documents, the Offering Documents incorporated by reference the Company's 2016 Form 10-K and February 16, 2017 Form 8-K, which included the Company's fourth quarter and full year 2016 earnings press release. Accordingly, the false and misleading statements included in the Company's 2016 Form 10-K and fourth quarter and full year 2016 earnings press release were incorporated by reference therein. These statements continued to be false and misleading for the same reasons as described above in ¶¶ 113, 118.

**First Quarter 2017**

122.   On May 9, 2017, the Company issued an earnings press release announcing strong financial results for first quarter 2017 ended March 31, 2017 and raising TrueCar's guidance for the full year 2017. Defendant Guthrie represented that Defendants were "pleased with the financial results in the first quarter of fiscal 2017 and the momentum we are building as we head into the seasonally strongest part of our year."

123.   On TrueCar's May 9, 2017 first quarter earnings call, defendant Guthrie continued to stress the Company's positive future prospects and growth: "While we still have plenty of work to do, I'm pleased to say that we are starting 2017 with significant momentum." Additionally, defendant Perry represented that USAA, "which had really healthy growth," was a "great grower" for the Company.

124.   The statements in ¶¶ 122 through 123 above were materially false and misleading when made and omitted to state material facts. In particular, USAA was not going to be a "great grower" for the Company. In reality, The Individual Defendants knew, or disregarded with deliberate recklessness, that USAA had decided to significantly change its co-branded website with TrueCar – changes that would dramatically reduce the volume of purchases generated by USAA. As former employees confirmed, by at least January 2017, TrueCar "was informed by USAA

of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar. As defendant Perry later admitted: "we saw these [changes] coming. It wasn't like we were blind to them." Moreover, it was widely known within TrueCar that changes to USAA's website would negatively and materially impact TrueCar's business and revenue as even minor changes had harmed the Company on previous occasions. Indeed, "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform." The changes known to the Individual Defendants were far more significant than merely changing the location of links to the TrueCar platform. Thus, the Individual Defendants had no reasonable basis to attribute future unit and revenue growth to USAA because they knew of, or disregarded with deliberate recklessness, undisclosed materially adverse facts that seriously undermined the validity of their representations.

125.   On May 10, 2017, the Individual Defendants caused the Company to file with the SEC its Form 10-Q for first quarter of 2017 ("1Q 2017 Form 10-Q"), which was signed by defendants Guthrie, Perry, and Pierantoni. In the Company's 1Q 2017 Form 10-Q, the Individual Defendants caused the Company to make the same misrepresentations made in the Company's 2016 Form 10-K, as described above in ¶¶ 114-117, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts. These statements continued to be materially false and misleading for the reasons described above in ¶ 118.

**SECOND QUARTER 2017**

126.   On August 8, 2017, the Company issued its earnings press release for the second quarter 2017 and on August 9, 2017, the Individual Defendants caused the Company to file a Form 10-Q for the second quarter of 2017 ("2Q 2017 Form 10-Q"), which was signed by defendants Guthrie, Perry and Pierantoni. By this time,

USAA had implemented what the Individual Defendants would themselves call a "significant redesign" of the car buying site, and as they would admit, the "USAA shortfall [had] hit the numbers" by August.

127. Remarkably, in the 2Q 2017 Form 10-Q, the Individual Defendants made the same misrepresentations made in the Company's 2016 Form 10-K, namely that if USAA were to change the car buying website "in the future," TrueCar's "revenue, business and financial results will be harmed."

128. These statements were materially false and misleading, and omitted material facts when made. Specifically, the representations to investors of what would happen if USAA were to change their co-branded website "in the future" was false because, as the Individual Defendants would soon be forced to admit, by August 2017, USAA had already significantly redesigned the car buying website, and had implemented its significant redesign weeks prior, such that the "USAA shortfall [was] hit[ting] the numbers." Thus, the Individual Defendants' representation of the "risk" that changes to USAA's website "may in the future adversely affect the volume of user traffic we receive from USAA" was clearly false, as that risk had without question materialized.

129. Defendant Perry also continued to emphasize the Company's prospects and growth in the Company's August 8, 2017 earnings release, stating: "The momentum that we have been building over the past few quarters at TrueCar is continuing quite nicely . . . We're growing well . . . we're expanding our business; and we're producing operating leverage all while making key investments for the long term."

130. The August 8, 2017 press release also updated the Company's guidance for the third quarter 2017, stating that "[u]nits are expected to be in the range of

265,000 to 270,000" and "[r]evenues are expected to be in the range of $85.0 million to $87.0 million."

131.   Guidance for the full year 2017 was also raised: "[u]nits are expected to be in the range of 975,000 to 985,000" and "[r]evenues are expected to be in the range of $325.0 million to $329.0 million."

132.   Moreover, on TrueCar's August 8, 2017 second quarter earnings call, the Individual Defendants continued to mask the Company's issues with USAA's website change, failing to disclose that USAA's co-branded website with TrueCar had already undergone its "significant website redesign," that had and would continue to profoundly reduce TrueCar's overall traffic, unit sales, and revenues.

133.   Defendant Guthrie added that "[i]t's been a great first half of 2017. And we're excited about continuing to expand and grow our business in the second half . . . our dealer network is able to close on a record number of end market prospects generated by our TrueCar branded channel, USAA and other high-growth partners such as Chase and Sam's Club."

134.   Furthermore, on the second quarter earnings call, defendant Guthrie represented "high unit growth rates," stating: "And finally, we are already seeing signs of high unit growth rates as our July results come in. As a result, we expect Q3 units to be in the range of [265,000 to 270,000] or 20% to 22% year-over-year growth."

135.   In response to analyst inquiry, Guthrie further noted "continued strong growth in units," stating:

> Of all the metrics, I'd say I don't think we could be much happier about the unit numbers than we are. And we just have really produced really fantastic unit growth. We're seeing, as the third quarter starts, continued strong growth in units that's embedded in the guidance that we gave you on units and it's

embedded in the guidance that we gave on units for the year as a whole in addition to Q3.

136.   The representations made in ¶¶ 129 through 135 above were materially false and misleading, and omitted material facts when made. Specifically, USAA was not going "to expand and grow [TrueCar's] business in the second half" of 2017. The truth was exactly the opposite. Indeed, rather than witnessing unit growth in the third quarter, the Individual Defendants were now witnessing that the units generated by USA – which typically accounted for nearly a third of the Company's annual units and revenues – were rapidly declining. As defendant Guthrie explicitly admitted, by August, TrueCar's revenues had already been materially impacted by the "significant website redesign." Defendants thus had no reasonable basis to represent 20% to 22% year-over-year unit growth. The Individual Defendants knew, or disregarded with deliberate recklessness, that the raised outlook for 3Q 2017 and FY 2017 did not reflect the reality of the impact caused by USAA's website change. The guidance issued was materially false and misleading because at that time the Individual Defendants knew that as a result of the material changes to USAA's website, units generated through the USAA website were materially declining.

137.   On September 7, 2017, defendants Guthrie and Perry presented at the Citi Global Technology Conference. Defendants Guthrie and Perry emphasized the importance of unit growth and how it was a vital metric that was closely followed. Specifically, defendant Perry represented that unit growth would continue, stating: "unit growth is really the most important metric in our business because -- and you're seeing that grow in the mid-20% range now. We'll continue to grow nicely because of conversion and closed rate improvements."

138.   Moreover, in discussing how the Company "do[es] a fairly good job forecasting units" and is "more focused on the units side of our business, especially

1  in the last 1.5 years to 2 years," defendants Perry and Guthrie both assured investors

2  that "units are growing nicely."

3       139.   The representations made in ¶¶ 137 through 138 were materially false

4  and misleading, and omitted material facts when made. Specifically, units were not

5  "growing nicely" and growth was not going to be in the mid-20% range. The truth

6  was exactly the opposite. Indeed, rather than experiencing unit growth three months

7  after the website change was implemented, the units generated by USAA – which

8  typically accounted for nearly a third of the Company's annual units and revenues –

9  were rapidly declining. As Defendant Guthrie admitted: "[w]e really started to see

10  [the shortfall] in August. In September, the drop was fairly significant." Thus, there

11  was no reasonable basis for statements to the contrary. Simply put, the Individual

12  Defendants knew as a result of issues with the USAA website change that units were

13  not growing, but rather were materially declining and that TrueCar would fail to

14  meet its represented units range for the third quarter.

15  **THE INSIDER SELLING DEFENDANTS REAP THE BENEFITS**

16  **OF THEIR MATERIAL NON-PUBLIC KNOWLEDGE**

17       140.   Based on their knowledge of material, non-public information regarding

18  the Company, defendants Guthrie and Pierantoni, the Company's CFO and CAO,

19  respectively – along with several other Company insiders – dumped millions of

20  dollars of TrueCar shares while the stock price was artificially inflated. In sum, these

21  defendants engaged in massive and suspiciously timed insider sales, collectively

22  selling over 1.1 million TrueCar shares and raking in gross proceeds in excess of

23  $21 million during the relevant time period.

24       141.  As described herein, by January 2017, USAA had informed the

25  Individual Defendants that it was changing the co-branded car-buying website

26  maintained by TrueCar. That same month, TrueCar filed a shelf registration

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statement for its April 26, 2017 secondary offering, in which the Company sold 1,150,000 shares and realized approximately $19 million in proceeds, while USAA and Company insiders – including entities affiliated with TrueCar directors Dietz, Yadigaroglu and Agrawal – sold approximately 9.8 million shares, realizing over 80% of the proceeds from the offering, or over $160 million.

142. Notably, director defendant Yadigaroglu, through the Capricorn Group, made his largest ever sale of TrueCar stock on May 2, 2017, selling 509,459 shares of TrueCar stock for proceeds of $8,406,074.[6] Director Defendant Dietz, through Upfront Ventures, also made his largest trade ever May 2, 2017, selling 1.321 million shares for proceeds of $21,791,418:[7]

| Date | Insider | Shares | Proceeds | Percentage of Holdings Sold |
|---|---|---|---|---|
| 5/2/17 | Dietz (Upfront II) | 1,273,156 | $21,007,074 | 25% |
| | Dietz (Upfront II Investors) | 13,000 | $214,500 | 2% |
| | Dietz (Upfront II Partners) | 34,536 | $569,844 | 25% |
| | Yadigaroglu (Capricorn | 1,790 | $29,040 | 23% |

[6] According to the Form 4 filed by Yadigaroglu with the SEC on May 4, 2017, the sales were made by entities in which Yadigaroglu shares with three individuals, voting and investment control including Capricorn Investment Group LLC ("Capricorn Group"), The Skoll Foundation ("Skoll Foundation"), The Skoll Fund ("Skoll Fund"), and Capricorn S.A. SICAV-SIF-Global Non-Marketable Strategies Sub-Fund ("Capricorn SA"), Capricorn AIP-Private Investment Fund I, L.P. ("Capricorn AIP"), HIT Splitter, L.P. ("HSLP") and Carthage, L.P. ("Carthage"). Yadigaroglu has been Managing Principal at Capricorn Group since 2004.

[7] According to the Form 4 filed by Dietz with the SEC on May 4, 2017, the sales were made by Upfront II, L.P., Upfront GP II, L.P., Upfront II Investors, L.P. and Upfront II Partners, L.P. ("Upfront"). Dietz is a founding partner of the venture capital firm which was formed in 1996 under the name GRP Partners or Global Retail Partners and renamed Upfront Ventures in 2013. Dietz ceased being a partner of Upfront in July 2016. According to the Offering Documents, Upfront sold 1,500,000 shares in the 2017 Secondary Offering.

| | | | | |
|---|---|---|---|---|
| | Group) | | | |
| | Yadigaroglu (Skoll Foundation) | 207,026 | $3,415,929 | 23% |
| | Yadigaroglu (Skoll Fund) | 176,514 | $2,912,481 | 23% |
| | Yadigaroglu (Capricorn SA) | 62,578 | $1,032,537 | 23% |
| | Yadigaroglu (Capricorn AIP) | 46,163 | $761,690 | 23% |
| | Yadigaroglu (HSLP) | 7,252 | $119,658 | 23% |
| | Yadigaroglu (Carthage) | 8,136 | $134,244 | 23% |
| | Agrawal (Vulcan) | 1,134,923 | $18,726, 230 | 23% |

143.   While the Officer Defendants did not sell any TrueCar stock in the Offering, they were prevented from doing so by a 90-day Lock-Up Period scheduled to expire on July 25, 2017.

144.   On July 17, 2017, TrueCar's stock price reached its relevant period high of $21.75 per share, or 64% higher than the beginning of the same period. Approximately one week later, on July 26, 2017, the day after the Lock-Up Period expired, and when TrueCar stock was still trading near its peak value (between $19 - 21 per share), several TrueCar insiders, including defendants Guthrie and Pierantoni, began selling substantial amounts of their TrueCar shares, and heavy selling continued through October 2017, shortly before the truth about the USAA website changes was revealed in early November 2017. Aside from defendants Guthrie and Pierantoni, the selling insiders included Neeraj Gunsagar (Chief Marketing Officer), Jeffrey Swart (General Counsel) and Brian Skutta, the Company's Executive Vice President of Dealer Sales at TrueCar – i.e., the department directly in charge of monitoring TrueCar's unit sales.[8]   As the chart below shows, these insiders

---

[8] While the insider sales by Guthrie, Pierantoni, Gunsagar and Swart were made pursuant to 10b5-1 trading plans, these officers simultaneously adopted the plans

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

collectively sold approximately 1.1 million TrueCar shares during this time period, grossing over $21 million in proceeds:

| Date | Insider | Shares | Proceeds |
|---|---|---|---|
| 7/26/17 | Guthrie | 70,353 | $1,392,117 |
| | Pierantoni | 55,895 | $1,107,501 |
| | Gunsagar | 70,182 | $1,389,608 |
| | Swart | 34,863 | $690,861 |
| 7/27/17 | Guthrie | 146,888 | $2,774,511 |
| | Gunsagar | 87,978 | $1,662,180 |
| 7/28/17 – 8/4/17 | Guthrie | 520,675 | $9,794,980 |
| 9/6/17 – 9/7/17 | Brian Skutta | 117,410 | $1,997,228 |
| 9/18/17 | Gunsagar | 10,442 | $172,941 |
| | Pierantoni | 3,964 | $65,653 |
| 10/2/17 | Gunsasgar | 1,096 | $17,295 |
| 10/3/17 | Pierantoni | 2,663 | $41,786 |
| 10/15/17 | Gunsagar | 1,882 | $28,649 |
| | | | |
| **TOTAL:** | | **1,124,291** | **$21,135,310** |

145.   Significantly, a majority of these insider sales, which amount to $18.8 million, or roughly 80% of the total proceeds insiders received from the sales, occurred within a week of the 90-day Lock-Up Period expiring on July 25, 2017, when TrueCar stock was trading closest to its relevant time period high. It is no coincidence that defendants Guthrie and Pierantoni, and Company officers Skutta and Gunsagar, exercised stock options for these sales that were not set to expire for

during the relevant time period on May 12 and 18, 2017, and months after they knew, or disregarded with deliberate recklessness, that USAA had informed TrueCar about the significant website redesign. Moreover, these plans permitted the officers to sell unusually large amounts of TrueCar stock as soon as the 90-day Lock-Up Period expired on July 25, 2017. Although Skutta was also subject to the 90-day Lock-Up Period, he did not sell his TrueCar shares pursuant to a 10b5-1 trading plan.

another six years, with certain of the stock options Guthrie exercised not set to expire for another nine years. A chart provided in the Class Complaint illustrates the insider sales after expiration of the Lock-Up Period:



Class Complaint ¶ 133.

146.   Additionally, all of these insiders sold substantial percentages of their TrueCar holdings, with defendants Guthrie and Pierantoni, and Company executive Skutta, selling 50% or more of their respective TrueCar holdings. Each of these insiders' total sales and gross proceeds during the relevant time period, and the percentage of their TrueCar holdings that they respectively sold, are as follows:

| Insider | Total Shares Sold | Total Gross Proceeds | Percentage of Holdings Sold |
|---|---|---|---|
| Guthrie | 737,961 | $13,961,608 | 54% |
| Pierantoni | 62,522 | $1,214,940 | 50% |
| Gunsagar | 171,580 | $3,270,673 | 38% |
| Swart | 34,863 | $690,861 | 26% |
| Skutta | 117,410 | $1,997,228 | 50% |

147.   As the charts *supra* show, defendant Guthrie, who sold over half of his holdings in the few days after the Lock-Up Period expired, and at prices near TrueCar's high before the truth was revealed, reaped approximately $14 million in gross proceeds from his insider sales alone, the most of all of the insider sellers by far. Defendant Guthrie also made the most false statements during the relevant time period, representing the Company's accelerating unit growth driven by the USAA affinity partnership that purportedly caused him to raise the Company's unit and revenue guidance twice between February 16 and November 6, 2017, despite knowing there was no way TrueCar could ever achieve the raised guidance because of the significant USAA website changes that would soon go into effect.

148.   Additionally, defendant Pierantoni, who was TrueCar's Chief Accounting Officer and, along with Defendant Guthrie, signed TrueCar's SEC filings falsely warning of the "future" risk that USAA "may" change its website "in the future" when in fact, that risk had long ago materialized – also sold 50% of his holdings, reaping gross proceeds of $1.2 million.

149.   All of these insiders' sales contrasted starkly with their sales prior to the relevant time period. Most strikingly, defendant Guthrie did not sell any TrueCar stock in the twelve months before the relevant time period. Swart likewise sold no TrueCar stock during that time. While defendants Pierantoni, Gunsagar and Skutta sold some of their TrueCar stock in the year prior to the relevant time period, these sales were dwarfed by their sales listed above. Specifically, Pierantoni sold only 3,769 TrueCar shares in November 2016, for gross proceeds of $45,095, versus the $1.2 million Pierantoni grossed from his relevant sales of 65,222 TrueCar shares during the time period in which the misstatements are alleged. Gunsagar sold 5,000 TrueCar shares in November 2016 for gross proceeds of $63,850, which pales in comparison to his sales of 171,580 TrueCar shares for approximately $3.3 million in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

gross proceeds between February 16 and November 6, 2017. Finally, Skutta sold 4,081 shares in November 2016 for gross proceeds of $52,277, significantly less than his sales of 117,410 shares grossing nearly $2 million during the period in which the misstatements are alleged.



*See* Class Complaint ¶ 137.

The Director Defendants' stock sales in August 2017 are likewise suspicious:

| Date | Insider | Shares | Proceeds | Percentage of Holdings Sold |
|---|---|---|---|---|
| 8/18/17 | Buce | 32,999 | $545,999 | 18% |
| 8/15/17 | Krafcik | 10,000 | $165,500 | 14% |
| 8/23/17 | Yadigaroglu (Capricorn AIP) | 63,232 | $1,036,790 | 42% |
| | Yadigaroglu (HSLP) | 9,934 | $162,884 | 42% |
| 8/24/17 | Yadigaroglu (Capricorn AIP) | 42,865 | $708,327 | 49% |
| | Yadigaroglu (HSLP) | 6,735 | $111,326.98 | 49% |
| 8/25/17 | Yadigaroglu (Capricorn AIP) | 35,581 | $581,596 | 79% |

| | Yadigaroglu (HSLP) | 5,590 | $91,372 | 79% |
|---|---|---|---|---|
| 8/28/17 | Yadigaroglu (Capricorn AIP) | 9,678 | $159,625 | 100% |
| | Yadigaroglu (HSLP) | 1,520 | $25,070 | 100% |
| 8/31/17 | Krafcik | 10,000 | $165,500 | 16% |

150. Indeed, Yadigaroglu's funds, Capricorn AIP and HSLP, unloaded 100% of their TrueCar shares in the five-day period between August 23 and August 28, 2017 when the Company's stock was trading at artificially inflated prices.

151. In sum, the staggering amount of these insiders' sales, their suspicious timing – beginning immediately after the Lock-Up Period expired, occurring near the relevant time period high, and continuing until shortly before the truth came out in early November 2017 – support a strong inference of illegal insider trading and misappropriate of information. *See also* Order Denying Defendants' Motion to Dismiss, dated February 5, 2019 (Doc. No. 93) ("Further, Plaintiff has adequately alleged a strong inference of scienter by alleging that Defendants knew about USAA's website redesign and its impact as of January 2017 and that Guthrie and Pierantoni sold TrueCar stock in sales that were suspicious in their timing, size, and amount, especially in light of Guthrie's and Pierantoni's prior sales."). That inference is bolstered by the fact that (i) each of these insiders sold large percentages of his TrueCar holdings, with defendants Guthrie and Pierantoni selling half or more of their total holdings; (ii) the insiders sold in concert with each other, with 80% of the sales occurring simultaneously in late July 2017, immediately after the Lock-Up Period expired and soon after the USAA website changes were implemented; and (ii) all of these insiders' sales between February 16 and November 6, 2017 were dramatically out of line with their sales (or lack thereof) in the twelve months prior to that time period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANTS BREACHED THEIR FIDCUCIARY DUTIES AND CONSCIOUSLY DISREGARDED THEIR RESPONSIBLITIES TO TRUECAR

152.   As alleged above, numerous facts raise a strong inference that the Individual Defendants knew, or were deliberately reckless in disregarding, the true facts regarding USAA's "significant website redesign," and the dramatic impact it would have on TrueCar's revenues, units and financial results. These facts include, in addition to the allegations set forth above, the following:

- ***USAA informed TrueCar of the expected redesign in early 2017***. Former TrueCar employees provided detailed facts confirming that, by early 2017, USAA informed TrueCar of the significant website redesign, which the Individual Defendants knew would cause a dramatic decline in TrueCar's traffic, units and revenues. Indeed, as Defendant Perry admitted once the truth was revealed: "[W]e saw [the USAA website changes] coming. It wasn't like we were blind to them."

- ***Management directed internal meetings to take place informing staffers of USAA's redesign***. In late January 2017, TrueCar directed management of each of its departments to hold internal meetings with staffers to inform them of USAA's significant website redesign that would be implemented by June 2017, and the expected negative fallout it would cause to TrueCar's bottom line. Class Complaint ¶¶ 39-50, 140.

- ***Staffers were shown presentations and given "Call Flow Sheets" detailing the exact changes USAA planned.*** Former employees described how, at the Company's internal meeting for the Consumer Support department, staffers were shown presentations detailing the exact changes USAA would implement, which consisted of a series of additional questions USAA members would be asked about their personal finances before they could

66

access the TrueCar car buying site. They were also provided with "Call Flow Sheets," or template forms that were specifically designed for the expected influx of USAA member complaints in response to the changes. Class Complaint ¶ 140.

- **_Management knew USAA's changes would adversely affect TrueCar._** Management was clear that USAA's significant changes to the car buying site would hurt TrueCar's USAA traffic and therefore its financial results. No less than three former employees, CWs 1, 4 and 5, provided detailed accounts independently corroborating the timing and substance of the Consumer Support meeting, which was attended by members of senior management, including Brandie Aldrich, former Senior Manager of Consumer Support. Class Complaint ¶¶ 39-50.

- **_The Individual Defendants knew that even negligible changes by USAA would, and indeed had, hurt TrueCar._** TrueCar acknowledged in its own SEC filings that even minor changes to the USAA car buying site would significantly impact the Company's financial results. TrueCar explicitly stated in its SEC filings that "[s]hould USAA . . . decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed." Those filings also provided a specific example of a relatively minor change to the car buying site by USAA that previously had a significant impact on the Company's financial results, stating: "For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform." In light of the fact that the changes here amounted to, as Defendants admitted, a "significant website redesign," there was no question Defendants knew the changes would profoundly and adversely affect the Company's financial results.

- **_TrueCar was responsible for hosting, managing and operating the car buying website for USAA_**. As the Company's own SEC filings disclosed, as part of its affinity partnership with USAA, TrueCar was in charge of "maintaining" the car buying website for USAA, meaning that, as outlined in the Services Agreement

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

between TrueCar and USAA, TrueCar was in charge of hosting, managing and operating the site. Class Complaint ¶¶ 31-35. This meant that, as confirmed by former TrueCar employees, TrueCar would have been directly involved in any alterations affecting the car buying site, and would have had to have been informed of such changes well in advance of their implementation. Class Complaint ¶¶ 49-50. For example, CW 2, former Senior Partner Development Manager at TrueCar's offices in Santa Monica, stated that TrueCar's creative team worked closely with USAA on the car buying site, and would have been involved in any process to change the site since the site was "owned and operated by TrueCar." CW 2 further stated that the particular changes USAA implemented here would have taken at least "months to add," requiring countless meetings between the two companies and "lots of testing before it was made live." Indeed, CW 6, a former TrueCar Software Engineer, stated that his superior Marco Santini—the Senior Director of Development at TrueCar – had attended "numerous meetings" with USAA personnel throughout early to mid-2017. *See id.*

- ***TrueCar had a highly intertwined relationship with USAA***. Aside from managing the car buying website for USAA, TrueCar's relationship with USAA was highly intertwined. Class Complaint ¶¶ 28-38. According to analysts who followed TrueCar, USAA was "pivotal to [TrueCar's] beginnings," as it was its main investor at the Company's inception, and remained its largest shareholder—owning 14% at the outset of the relevant time period and throughout.

- ***Claus was the USAA Board representative***. USAA also had long had representation on TrueCar's Board, with defendant Claus becoming the USAA Board representative in April 2014. Two years later, Defendant Claus was elected as Chairman of TrueCar's Board, a role he held throughout the relevant time period.

- ***USAA essentially controlled TrueCar's business via the Services & Maintenance Agreement.*** Additionally, as the Services & Maintenance Agreement between TrueCar and USAA showed, and as former TrueCar employees confirmed, USAA largely "dictated"

68

TrueCar's business, providing detailed directions on how TrueCar was to manage the car buying site. Specifically, USAA mandated that TrueCar drug test and conduct thorough background checks of its employees who had access to USAA member data or who interacted with USAA members, allow USAA to make random physical visits of TrueCar's facilities, and require its employees to attend USAA orientations and culture training sessions before they could work on the car buying site. The Individual Defendants otherwise admitted that, even at the executive level, TrueCar interacted with USAA on a day-to-day basis. Class Complaint ¶¶ 32-35. Given USAA's extensive involvement in TrueCar's business, there is no question TrueCar and its executives were well informed about USAA's decision to significantly redesign the car buying site.

- ***USAA was critically important to TrueCar's business***. As TrueCar acknowledged in its SEC filings, USAA was "[t]he largest source of user traffic and unit sales from our affinity group marketing partners," accounting for 32% of all units in 2016. TrueCar's SEC filings stated that, as a result, "USAA has a significant influence on our operating results."

- ***The Officer Defendants served on the Company's Disclosure Committee, which held meetings prior to the filing of TrueCar's quarterly and annual reports during the relevant time period to ensure their accuracy***. Significantly, the duties of Disclosure Committee members included, among other things, making periodic inquiries to relevant Company personnel about whether there were any changes to TrueCar's business that would require disclosure. Such inquiries would have necessarily included inquiries to TrueCar employees who managed the Company's USAA affinity partnership, which accounted for nearly a third of TrueCar's annual revenues, about whether USAA had decided to change anything regarding the car buying site.

- ***The Individual Defendants closely monitored unit growth.*** The Individual Defendants made repeated public statements representing USAA's contribution to the Company's growth, claiming it would consistently achieve unit and revenue growth in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

excess of 20% throughout 2017. Defendants Perry and Guthrie repeatedly touted not only the significance of its affinity partnership with USAA, but how that partnership would be a key driver of the Company's accelerating unit and revenue growth—allowing that growth to consistently remain in excess of 20%—for the remainder of 2017. These statements demonstrate that the Individual Defendants closely monitored unit growth (which they publicly acknowledged they monitored in real time, viewed it as critical, and were incentivized to give investors the impression that it would remain at the record "mid- 20%" range.

- ***Defendants had "real time" access to the Company's sharp decline in USAA traffic and units***. As multiple former TrueCar employees confirmed, the Individual Defendants had internal access to USAA traffic and unit data through multiple Company databases, including "Dashboard" and "Turbo System," and closely monitored this information, which was critical to TrueCar's success, in "real time." Class Complaint ¶¶ 69-70. The Individual Defendants therefore witnessed the dramatic and sharp decline in USAA traffic and revenues that former TrueCar employees confirmed occurred immediately after USAA's significant website redesign was implemented in June 2017. Class Complaint ¶¶ 63-70. Indeed, defendant Guthrie admitted after the truth about the significant USAA website redesign was revealed that he had contemporaneously witnessed USAA unit growth sharply fall in August 2017. Class Complaint ¶ 85.

- ***The declines in financial performance were discussed at a "fireside" meeting in August 2017.*** As CW 8 stated, senior management had in fact held a "fireside" meeting that month which defendant Perry attended—to discuss "downward trend" meaning the dramatic declines in traffic, units and revenues True Car was experiencing. Class Complaint ¶ 68.

- ***Defendant Guthrie's and Pierantoni's extensive and suspiciously timed insider trading further demonstrates bad faith and disloyalty***. As set forth above, defendants Guthrie and Pierantoni each sold half or more of their total TrueCar holdings, with the majority of those sales occurring in the week after the 90-day

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Lock-Up Period following the April 26, 2017 Offering expired. By that time, TrueCar had implemented USAA's significant website redesign, though investors did not know it yet. Significantly, defendant Guthrie alone obtained nearly $14 million in proceeds from his sales of TrueCar stock. Guthrie and Pierantoni were required to review and sign an acknowledgement that they had read and understood TrueCar's Code of Business Conduct and Ethics, which outlines TrueCar's prohibition on insider trading. Thus, defendants Guthrie and Pierantoni knew that selling their shares while in possession of material non-public information violated U.S. securities laws and TrueCar's Code of Business Conduct and Ethics.

- ***Defendant Guthrie's abrupt resignation is telling***. On January 28, 2018, only a few months after defendant Guthrie profited off substantial and suspiciously timed insider sales to the tune of $14 million – and less than three months after the truth was revealed about the USAA website redesign and its impact on TrueCar's business in November 2017 – defendant Guthrie abruptly resigned from his position as CFO of the Company, citing "personal reasons."

- ***The fact that the Individual Defendants knew about USAA's significant website redesign and its impact in January 2017 but revealed nothing until they were forced to do so in the third quarter of 2017 is probative of their bad faith and disloyal breaches of fiduciary duty***. Despite being informed by USAA about the significant website redesign months in advance of its implementation, the Individual Defendants did not cause the Company to inform investors. Instead, they continued to deceptively warn of USAA changing the car buying website as a substantial "risk" that had not yet occurred. The Individual Defendants revealed the truth only when they were forced to, in the third quarter of 2017 when they could no longer hide the impact of the USAA website changes on TrueCar's financial results. At the same time, certain of the Individual Defendants obtained tens of millions of dollars from their insider sales as a result of the market's ignorance of the significant USAA website changes and TrueCar's resulting inflated stock price.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- ***The misrepresentations made as a result of the Individual Defendants' breaches of fiduciary duties were material***. As set forth above, and as defendants themselves acknowledged in their public filings, USAA was critical to TrueCar's success, comprising 32% of its overall units and revenues on an annual basis. The Individual Defendants also referenced USAA as being a key affinity partnership that set it aside from its peers in a highly competitive industry. Their scheme to conceal a significant change in that key relationship that would profoundly impact TrueCar's unit and revenue growth was unquestionably material.

## DAMAGES TO THE COMPANY

153.   As a result of the Individual Defendants' breaches of fiduciary duty, the Company has suffered, and continues to suffer, extensive damage.

154.   TrueCar has expended and will continue to expend significant sums of money that it otherwise would not have spent. Such expenditures include, but are not limited to:

    a) Costs incurred in investigating and defending TrueCar and the Individual Defendants in the Securities Class Action, plus potentially millions of dollars in settlements or to satisfy an adverse judgment; and

    b) Costs incurred from compensation and benefits paid to the Individual Defendants , which compensation was based at least in part on TrueCar's artificially inflated stock price and the misapprehension that the Individual Defendants were acting in compliance with their fiduciary duties.

155. As a result of the Individual Defendants' misconduct, TrueCar's corporate image and goodwill have also been irreparably damaged.

## **DEMAND IS FUTILE**

156.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein. Presently, the Board consists of the following nine (9) individuals: Director Defendants Perry, Buce, Claus, Kratcik, Lantz, Nichols, Yadigaroglu, Mendel and non-defendant Phil McKoy. Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

157.   The Individual Defendants and, more specifically, each of the current directors is named as a defendant in the Securities Class Action. On February 5, 2019, the Court denied defendants' motion to dismiss holding, among other things, that plaintiffs adequately alleged "that Defendants made materially false and misleading statements by making risk statements regarding TrueCar's reliance on USAA's website without alerting the public that the risk had already come to fruition and by falsely representing that USAA would be a key driver of unit and revenue growth in 2017." Accordingly, the current directors face a substantial likelihood of liability in this action as well as in the Securities Class Action which renders them incapable of disinterestedly considering a demand to pursue the claims herein. *See* Order Denying Defendants' Motion to Dismiss, dated February 5, 2019 (Doc. No. 93). *See also, Pfeiffer v. Toll*, 989 A.2d 683, 690 (Del. Ch. 2010)(reversed on other grounds).

158.   Defendant Claus lacks disinterest given his relationship with USAA. From December 1994 to March 2014, Claus served in various senior executive roles at USAA, including Executive Vice President of USAA Enterprise Advice Group and President of USAA Financial Services Group. Previously, he served as the Senior Vice President and then President of USAA Investment Management Company and Vice President of Investment Sales and Services. From January 2009

through the present, Claus was and still is a member of the board of directors of USAA Real Estate Company. Claus is USAA's Board representative and, in conspiracy with USAA, did not reveal material adverse information, allowing USAA to engage in substantial stock sales at artificially inflated prices, and reap substantial profits.

159.   Defendants Yadigaroglu, Buce and Krafcik further lack disinterest as a result of their insider sales during the relevant time period which sales were made while in possession of adverse non-public information regarding the Company's operations and financial condition. Indeed, during the relevant time period, Yadigaroglu, Buce and Krafcik knew that TrueCar's financial condition was materially overstated as a result of USAA's significant website redesign as detailed herein. Yadigaroglu's stock sales on May 2, 2017, August 23, 24, 25 and August 28, 2017 constitute a breach of his fiduciary duties of loyalty and good faith and misappropriation of information rendering any demand on Yadigaroglu a useless and futile act. Krafcik's stock sales on August 15 and August 31, 2017 constitute a breach of his fiduciary duties of loyalty and good faith and misappropriation of information rendering any demand on Krafcik a useless and futile act. Buce's stock sale on August 18 constitute a breach of his fiduciary duties of loyalty and good faith and misappropriation of information rendering any demand on Buce a useless and futile.

160.   As specified herein, demand is excused because this Verified Shareholder Derivative Complaint alleges with particularity that at least half of the members of the current Board breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. Indeed, during the relevant period the Individual Defendants caused or allowed the Company to fail to maintain proper internal controls and oversight mechanisms and to issue false and misleading

statements. The Individual Defendants' misconduct has severely damaged the Company. Lawsuits alleging violation of the federal securities laws have been filed against the Company and all of the Individual Defendants face a substantial likelihood of liability in the Securities Class Action. Further, TrueCar's reputation and goodwill have been tainted by the misconduct described herein.

161. TrueCar's SEC filings state that its "business and affairs are managed under the direction of the Board[.]" By virtue of their positions as directors of TrueCar and as signatories of certain of TrueCar's SEC filings, including its 2016 Form 10-K and the Registration Statement in connection with the April 2017 Offering, each of the Director Defendants was obligated to comply with their fiduciary duties to TrueCar by ensuring that the Company had sufficient practices and procedures in place to maintain the truthfulness and accuracy of TrueCar's public disclosures and SEC filings. Given the importance of the USAA affinity group partnership to TrueCar, the unique risks accompanying that partnership and past adverse experiences related to the same, and the fact that the USAA relationship drove 32% of the Company's revenue, the Director Defendants knew or were reckless in not knowing that the Company was issuing materially false and misleading statements during the relevant time period.

162. During the relevant time period, the Audit Committee consisted of defendants Claus, Buce and Lantz. Among other things, the Audit Committee was responsible for overseeing "Risk Assessment and Risk Management" as required by the Audit Committee Charter adopted on April 23, 2014. Indeed, "Risk Assessment and Risk Management is one of the six main purposes set out in the Audit Committee Charter in effect during the relevant time period. In particular, the Audit Committee was responsible for reviewing and discussing with management, the internal auditors and the independent auditor "the Company's major financial risk

exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management." Additionally, defendants Claus, Buce and Lantz would have reviewed all earnings press releases and earnings guidance along with the Company's annual audited and quarterly unaudited financial statements on Forms 10-K and 10-Q as required by the Audit Committee Charter. The Audit Committee was required to "report regularly to the Board with respect to the Audit Committee's activities and recommendations." The Audit Committee's responsibility for the accounting and financial reporting processes and internal controls over the same are also one of the six primary purposes of the Audit Committee.

163.   The Board as a whole was also required to ensure that TrueCar's "public reports and communications are complete, fair, accurate and understandable." *See* Code of Business Conduct and Ethics, adopted on April 30, 2014 (the "Code of Ethics"). Specifically, the Code of Ethics states that "Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications."

164.   The Code of Ethics expressly prohibits intentional misconduct, stating that "you may not intentionally misrepresent TrueCar's financial performance or otherwise intentionally compromise the integrity of TrueCar's reports, records, policies and procedures. For example, you may not: report information or enter information in TrueCar's books, records or reports that fraudulently or intentionally hides, misrepresents or disguises the true nature of any financial or non-financial transaction or result."

165.   In addition, by its Code of Ethics, each of the directors was responsible for bringing information regarding materially misleading disclosures to the Legal or Human Resources Department: "If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Legal or Human Resources Department."

166.   Despite their duties and responsibilities, the members of the Board and Audit Committee, knowingly and consciously failed to ensure that the Company had internal controls, policies and oversight mechanisms in place to prevent the wrongdoing alleged herein. As such, the current members of TrueCar's Board face a substantial threat of liability and cannot fairly consider a demand to commence litigation.

167.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on intentional, reckless and disloyal misconduct. Thus, none of the Individual Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

168.   Read together with the facts summarized above and alleged with particularity herein, pre-suit demand is also excused as futile for the following reasons:

169.   In TrueCar's Proxy Statement filed on April 4, 2018, the Company admits that defendants Perry and Krafcik lack independence.   The principal professional occupation of defendant Perry is as TrueCar's President and Chief Executive Officer from which he derives significant compensation. Moreover, Krafcik served as TrueCar's President from April 2014 until September 2015.

170.   Defendant Claus lacks disinterest given his relationship with USAA. From December 1994 to March 2014, Claus served in various senior executive roles at USAA, including Executive Vice President of USAA Enterprise Advice Group and President of USAA Financial Services Group. Previously, he served as the Senior Vice President and then President of USAA Investment Management Company and Vice President of Investment Sales and Services. From January 2009 through the present, Claus was and still is a member of the board of directors of USAA Real Estate Company.

## CLAIMS FOR RELIEF

### COUNT ONE

**Derivatively for Contribution Under Sections 10(b) and
21D of the Exchange Act**

**(Against the Class Action Individual Defendants)**

171.   Plaintiff repeats and realleges all previous allegations set forth above, as though fully set forth herein.

172.   Those individual defendants named in the related Securities Class Action are referred to in this Count as the "Class Action Individual Defendants."

173.   This claim is brought derivatively on behalf of the Company against each of the Class Action Individual Defendants for contribution and indemnification.

174.   TrueCar is named as a defendant in the Securities Class Action filed in this Court, asserting claims under the federal securities laws for *inter alia*, violations

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of Sections 10(b), 20(a) of the Exchange Act and Sections 11, 12(a)(2) and 15 of the Securities Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the defendants as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company currently pending in this Court.

175. The Class Action Individual Defendants, as directors and officers, and otherwise, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about TrueCar and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

176. In addition, the Class Action Individual Defendants are liable under 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

177. Accordingly, TrueCar is entitled to all appropriate contribution or indemnification from the Class Action Individual Defendants.

## COUNT TWO

### Breach of Fiduciary Duty

### (Against All Individual Defendants)

178. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

179. Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

180. Under the current circumstances, the Individual Defendants also had a duty to:

(a) act in the interests of the Company and all of its equity owners; and

(b) act in accordance with the fundamental duties of loyalty, care and good faith.

181. Because of their respective positions with the Company, the Individual Defendants also are required to:

(a) act independently to ensure that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder; and

(b) ensure that if there are conflicts of interest between the Individual Defendants' interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Company and its public shareholders.

182. In causing or allowing the Company to fail to maintain adequate internal controls and procedures related to public disclosures and by causing or allowing the misdeeds described herein, the Individual Defendants have not taken any steps to protect the interests of the Company and, in fact, have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

183. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in improper practices. The Individual Defendants had actual knowledge of the misstatements and omissions of material fact set forth in this Complaint, or acted with reckless disregard for the truth. Such

material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TrueCar's securities. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, TrueCar has sustained significant damages.

185. Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on TrueCar's behalf.

186. Plaintiff and the Company have no adequate remedy at law.

**COUNT THREE**

**Unjust Enrichment**

**(Against All Individual Defendants)**

187. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

188. During the relevant time period, the Individual Defendants received bonuses, stock options, stock or similar compensation from TrueCar that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of the Individual Defendants' bad faith conduct, violation of the Company's governance documents and Code of Ethics, and self-dealing.

189. Plaintiff, as a shareholder and representative of TrueCar, seeks restitution from the Individual Defendants and seeks and order of this Court disgorging all profits, benefits and other compensation – including any salary, options, performance-based compensation, and stock – obtained by the Individual Defendants due to their wrongful conduct alleged in this Complaint.

**COUNT FOUR**

**Breach of Fiduciary Duty for Insider Selling and
Misappropriation of Information**

**(Against the Insider Selling Defendants)**

190.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

191.   At the time of the stock sales set forth above, the Insider Selling Defendants – defendants Guthrie, Pierantoni, Dietz, Yadigaroglu, Buce, Agrawal and Krafcik – knew or recklessly disregarded the information described in this Complaint and sold TrueCar common stock on the basis of that information.

192.   The information described above was proprietary non-public information concerning the affinity group partnership with USAA. The information was a proprietary asset belonging to the Company which the Insider Selling Defendants used for their own benefit when they sold TrueCar common stock.

193.   The Insider Selling Defendants' sales of TrueCar common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

194.   Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

<u>COUNT FIVE</u>

**Conspiracy to Engage in Insider Selling and Misappropriation of Information**

**(Against USAA)**

195.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

196.   At the time of the stock sales set forth above, USAA knew or recklessly disregarded the information described in this Complaint and sold TrueCar common

stock on the basis of that information.  USAA knew better than the public of the effect its decisions would have on TrueCar, knew that TrueCar was not disclosing accurate information to the public, knew that TrueCar has no plan to cope with USAA's material changes, and took advantage of this knowledge as a *de facto* insider with representation on the Board to sell shares at prices it knew to be inflated.

197.   The information described above was proprietary non-public information concerning the affinity group partnership with USAA. The information was a proprietary asset belonging to the Company and USAA jointly which USAA used for its own benefit when it sold TrueCar common stock.

198.   USAA's sale of TrueCar common stock while in possession and control of this material adverse non-public information was the culmination of a conspiracy in which USAA joined in a breach of the insiders' fiduciary duties of loyalty and good faith.

199.   Because USAA used joint proprietary information for USAA's own gain in conspiracy with insiders, the Company is entitled to the imposition of a constructive trust on any profits USAA obtained thereby.

## COUNT SIX

### Violation of Section 25402 of the California Corporations Code

### (Against the Insider Selling Defendants)

200.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

201.   At the time that the Insider Selling Defendants sold their TrueCar common stock as set forth in this Complaint, by reason of their high executive or directorship positions with TrueCar, these defendants had access to highly material information regarding the Company, including the information regarding the USAA

website redesign and its adverse consequences on TrueCar. Further, the Insider Selling Defendants received millions of dollars of proceeds from trading on material, non-public information which information was an asset of, and belonged exclusively to, TrueCar.

202.   At the time of the Insider Selling Defendants' sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of TrueCar shares at the time.

203.   Each of the Insider Selling Defendants had actual knowledge of material, adverse, non-public information and thus sold their TrueCar common stock in California in violation of California Corporations Code § 25402.

204.   Pursuant to California Corporations Code § 25502.5, each of the Insider Selling Defendants is liable to TrueCar for damages in an amount up to three times the difference between the price at which TrueCar common stock was sold by the defendant and the market value that stock would have had at the time of the sale if the information known to the defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

A.   Authorizing the maintenance of this action as a derivative action, with Plaintiff as the derivative Lead Plaintiff;

B.   Declaring that the Individual Defendants have violated their fiduciary duties to the Company, or (as to USAA) have conspired therein;

C.   Awarding compensatory damages against defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

D. Directing TrueCar to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect TrueCar and its shareholders from a repeat of the damaging events that occurred during the relevant time period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

E. a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

F. a provision to permit shareholders of TrueCar to nominate at least three candidates for election to the Board; and

G. appropriately test and then strengthen the internal compliance and control functions; and

H. Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

I. Granting such other or further relief as may be just and proper under the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 6, 2019                           Respectfully submitted,

                                               **MONTEVERDE & ASSOCIATES PC**

                                               By: _/s/ David E. Bower_
                                                   David E. Bower (BAR #119546)
                                               600 W. Corporate Pointe, Ste. 1170
                                               Culver City, CA 90230
                                               Telephone: (213) 446-6652

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Facsimile: (212) 202-7880
Email: dbower@moneverdelaw.com

-and-

Beth A. Keller
350 Fifth Avenue, Ste. 4405
New York, NY 10118
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
Email: bkeller@monteverdelaw.com

**PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz
208 East 51st Street
Suite 380
New York, NY 10022
Telephone: (212) 685-0969
Email: lpaskowitz@pasklaw.com

*Attorneys for Plaintiff Dean Drulias*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**<u>VERIFICATION OF PLAINTIFF</u>**

I, Dean Drulias, verify that I am a shareholder of Truecar Inc.. stock as stated in the foregoing Verified Shareholder Derivative Complaint, and that I have read the Complaint, and approve of its filing.  I hereby further verify that such Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March _____5_____, 2019

_____
Dean Drulias